## GENERAL BAKELITE CO. v. NIKOLAS.

### (District Court, E. D. New York. June 12, 1915.)

1. PATENTS ⚏328—VALIDITY AND INFRINGEMENT—VARNISHES.

   The Baekeland patents, No. 954,666, No. 1,018,385, and No. 1,037,719, each for a varnish, comprising a condensation product of phenol and formaldehyde and a solvent although based on prior patents to the same patentee for such condensation product and the process of producing the same, are for new products, not anticipated, and valid; also, *held* infringed.

2. PATENTS ⚏250—INFRINGEMENT—CHEMICAL PRODUCT.

   It is no defense to a charge of infringement of a patent for a product produced by chemical process to assert ignorance of the reactions which take place, and then to claim the right to combine substances, which, on analysis, are shown to cause the reactions of the process leading to the patented product and to obtain that product itself by methods shown to be those of the patent, even though never before understood until testified to upon the trial.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 390, 392, 393; Dec. Dig. ⚏250.]

3. WORDS AND PHRASES—"PYROXYLIN."
   "Pyroxylin" is nitrocellulose or gun cotton.

4. WORDS AND PHRASES—"REACTIVE FILM."
   A "reactive" film is one in which a chemical change or reaction occurs upon spreading the film and subjecting it to heat, light, air, motion, or electricity, but without the addition of any chemical substance.

In Equity. Suit by the General Bakelite Company against George J. Nikolas, trading as George J. Nikolas & Co. On final hearing. Decree for complainant.

See, also, 207 Fed. 111.

Charles Neave, of New York City (Byrnes, Townsend & Brickenstein, of Washington, D. C., of counsel), for plaintiff.

Pennie, Davis & Goldsborough, of New York City (William R. Rummler and Willard M. McEwen, both of Chicago, Ill., of counsel), for defendant.

CHATFIELD, District Judge. [1] The present action charges infringement of three patents, Nos. 954,666, issued April 12, 1910, upon an application filed November 22, 1909; 1,018,385, issued February 20, 1912, upon an application filed March 14, 1911; and 1,037,719, issued September 3, 1912, upon an application also filed March 14, 1911. In each case Leo H. Baekeland is patentee and has conveyed the patent (as well as others procured by him and referred to in the testimony) to the plaintiff in this action.

The application for the first patent was made as a division of a prior application filed October 15, 1907, and upon which patent 942,809 was granted, December 7, 1909.

The patentee is a citizen of the United States, born in Belgium and educated in various European countries. The testimony shows his wide training and experience, as well as the academic honors and scientific degrees obtained by him in Holland, Belgium, England, France, Germany and the United States. He has testified as an expert as well as patentee, and his qualifications are thus brought into consideration.

The testimony shows commercially successful accomplishments, as well as scientific investigation by the patentee in this country, and his appearance and testimony upon the witness stand have plainly shown mental capacity, scientific knowledge, and deductive ability which would accord with and be expected as the necessary foundation for such investigations and experimental operations as those involved in practicing or advancing the art and processes set forth in the patents as to which the present litigation has arisen.

The defendant is a practical manufacturer of varnishes in the city of Chicago, who disclaims knowledge of chemistry as a science, and who testified that, in the mixture and treatment of chemicals during the manufacture of varnish, he judged the reaction and formed all his conclusions from experience and appearances, without regard to the nature of the reaction taking place.

The plaintiff alleges infringement by the sale upon the open market of certain varnishes known as bedstead filter or gold lacquer or satin A. P. lacquer, of which admitted samples have been produced by the defendant during the course of the trial.

At the outset of the case, considerable point was made of the issue of infringement, by reason of the fact that the sample produced by the plaintiff, and obtained from a store used by the defendant as an agency in Brooklyn, was claimed by the defendant to be different in appearance from anything manufactured by him. The sample was therefore disavowed by the defendant as his product. The difference in appearance was never satisfactorily explained, but the chemical analysis of the contents and the analyses of the samples produced by the defendant were such that no issue as to the actual resemblance of the defendant's commercial product and the article described by the patents exists.

The defendant, however, contends that he does not do or use anything in the manufacture of his varnish which would be an infringement of the plaintiff's patents, and, in fact, denies the use of materials which the plaintiff, from analysis of the product, contends must be employed by him. This issue will be discussed in connection with the patents of the prior art, and we will take up at once the patents in suit and the patentee's work in connection therewith.

It appears from the record that the patentee was investigating the properties of what are known as condensation products of phenol (carbolic acid) and formaldehyde. He was seeking a commercial substitute for natural gum camphor, to be used in the manufacture of celluloid, and this led him to investigation of the condensation products above referred to, which are frequently called resins, in that they form a gum of more or less natural resinous appearance, when washed or dried after removal from the solution remaining after the reaction by which they have been formed.

It will be seen, from examination of the prior art, that such condensation products were comparatively well known by the year 1907, when a commercial demand for certain substances, in the manufacture of varnishes or coatings for metallic surfaces like chandeliers or bedsteads, and for electric devices, like insulating tubes, made the production of the articles entering into their composition commercially profitable.

The patentee tells us that as early as 1871 Prof. Baeyer and his pupils had described certain reactions between the phenols and the aldehydes. In the course of his investigations, he found a particular condensation product of phenol (generally in the form of carbolic acid) and formaldehyde, which resembled gum shellac. At this time gum shellac was selling for 50 cents a pound, and the patentee took up the investigation of the gum in question. The production was not uniform either in quantity or quality, and sometimes the condensation resulted in a bulgy, spongy mass, with which nothing could be done. After experiments enabled the patentee to produce substantially uniform results. He called the condensation product obtained "novolak," and began to make it in large quantities. The color of the novolak varies from light to dark brown. It is soluble in alcohol, and is fusible. If dis-

solved and used as a lacquer, it sets and dries like a vegetable gum varnish by evaporation of the solvent, but no change in the composition of the varnish coating takes place. Thus, like gum varnish, it can be re-dissolved or re-fused (that is, melted, not destroyed, by combustion), and turns red upon exposure to the air. Heating the product called novolak for several days did not change its quality of constant solubility, and the substance therefore would directly compete with the varnishes or lacquers made from a vegetable gum.

The patentee found that the soluble product was, in his opinion, that described in the De Laire (Belgian) patent 192,590, (French) 361,-539, and (British) 15,517 of 1905; and the Blumer patents, 12,880 of 1902 (British), 172,877 (German), and 6,823 of 1903 (British).

Sometimes, during the course of the reaction, a hard, insoluble substance resulted, which resisted all of the solvents that were tried thereon. Nothing but a destructive acid (like fuming nitric or sulphuric acid) seemed to have any effect, and the patentee, thinking that this product was of no practical value by itself, sought to find a method of effecting a synthesis of the substances entering into the condensation product and the fibers of soft wood. At this time he became acquainted with the work of a chemist named Kleeberg, who had produced a substance which he considered worthless and with which he could do nothing.

The Story patent (English) 8,875 of 1905, and the Luft patent (United States) 735,278, of 1903, as well as Blumer and De Laire, all started with the same raw materials and obtained different products. But all these products fell into two classes: (1) The novolak or permanently soluble and fusible condensation products; or (2) the insoluble products, in which class one phase of the Story patent, the product found by Kleeberg and that of the patentee, seemed to belong.

The patentee then continued his experiments in making the infusible product, and learned that with pure phenol, which was obtainable in crystallized form, the hard insoluble product could not be obtained, except after long heating at high temperature, while with a commercial carbolic acid results varied, but usually a soluble and fusible product resulted, or a reddish colored film was produced, after long heating. The patentee testifies that in these experiments he was using an equal volume of phenol and formalin with hydrochloric acid as a condensing agent. Washing the product with water and melting indicated the formation of the substance which the patentee calls novolak, unless the experiment resulted in the infusible substance resembling that obtained by Kleeberg.

The patentee then took 100 parts of phenol, 100 parts of formaldehyde, and a small amount of hydrochloric acid, which he heated in a sealed tube and obtained a clear, hard stick which proved to be totally insoluble and infusible. Upon repetition he was able to confirm the experiment and undertook to find a reason therefor. He found that, in the De Laire and Blumer methods, the product of the condensation when washed caused the removal of half the formaldehyde, as well as a part of the phenol. This having different proportions, they reached different results than the insoluble product of the plaintiff, who went on

to try the Story patent, with 95 per cent. commercial carbolic acid and formalin, in the proportions indicated by Story, and with no base, heating at 80 degrees. Long drying of the gum in a mold gave an insoluble product. In large volumes the Story process, with an excess of phenol, gave a soluble condensation product, although in very small quantities, or in a test tube or on a watch glass, at 80 degrees, with long drying, the insoluble product was generally obtained. Upon using a higher temperature, the substance (if in large quantity) itself produced heat and left a bloated, spongy residue. In small quantity, in a test tube, an insoluble reddish film was produced with the high temperature. When a solvent was used, a hard (but not insoluble) varnish would be made.

The patentee considering that commercial carbolic acid was composed mainly of cresols instead of phenol (hydroxybenzol) while pyridin was also present, and that there might be small quantities of base, undertook experiments by which, with the addition of a small amount of ammonia, the infusible product was obtained. He thus obtained a lighter colored film.

The patentee then tried caustic soda in small quantity, expecting, as in the Manasse patent, 526,786, and the Lederer patent, 563,975, to obtain only fusible products or oxybenzyl alcohol; but he obtained the infusible product even at a less temperature than at 80 degrees, and he from this worked out the proportion of base which ultimately resulted in claim 2 of the first patent in suit. The claims of this patent are as follows:

"1. A varnish containing a volatile organic solvent and a condensation product of a phenolic body and formaldehyde, said condensation product characterized by its capability of transformation under the action of heat into an insoluble and infusible body, and by the presence therein of a base condensing agent.

"2. A varnish containing a volatile organic solvent and a condensation product of a phenolic body and formaldehyde, said condensation product characterized by its capability of transformation under the action of heat into an insoluble and infusible body, and by the presence therein of a base condensing agent in proportions not exceeding one-fifth of the equimolecular proportion of phenolic body employed."

A number of addresses or printed articles setting forth, from time to time, the progress of the patentee in his investigations, have been put in evidence and used by the defendant, who calls attention to certain conclusions, modified in some ways by the conclusions stated in subsequent articles, as evidence that the patentee did not have any complete understanding of his claimed invention at the time of filing the application, in which the actual invention subsequently set forth in the claims of the patents as issued were described. This question can best be considered in connection with the patent applications themselves and with the amendment or suggestion of new claims presenting the ideas which the defendant now charges were not known or appreciated by the patentee as patentable parts of his original invention. But the file wrapper of patent 942,809 shows that as early as March 17, 1908, amendments were suggested showing the use of a base in the small proportions finally described as in claim 2 of the first patent in suit.

It appears from the record that upon the 13th day of July, 1907,

the patentee filed an application for a method of making insoluble products of phenol and formaldehyde, and patent 942,699 was granted upon December 7, 1909. This shows the use of heat and pressure with catalytic or condensing agents consisting of acid or metallic salts. This patent refers to application 358,156, filed February 18, 1907.

But in the meantime an application, upon the 18th of April, 1908, 383,864, for indurated product and method of preparing same, was divided and a separate patent issued, under No. 942,699, for the method, and on December 7, 1909, under No. 942,852, for the product. These also employed heat and pressure.

On October 15, 1907, the patentee filed an application, 397,560, for a condensation product and method of making same. This was not disposed of and fees paid until a renewal upon the 17th day of September, 1909, which resulted in patent 942,809, also issued December 7, 1909, for the product and method. This application was divided, by direction of the Patent Office, on the 22d of November, 1909, by which the first patent in this suit, or the so-called "Varnish" patent, was issued, under No. 954,666, on the 12th of April, 1910. These patents show the use of a base in small quantities and require heat or heat and pressure to form the condensation product.

Earlier than any of these applications, however, and on the 18th of February, 1907, the patentee filed an application for a method of indurating fibrous and cellular material, upon which he ultimately procured the issuance of patent 949,671, upon the 15th of February, 1910. This calls for heat, pressure, and acid salts.

There were also issued upon the 7th of December, 1909, two other patents, 942,808, for condensation product and method of making same, for which application had been filed October 26, 1907, and patent 942,700, for condensation product of phenol and formaldehyde and method of making same, upon an application filed December 4, 1907. These likewise called for the use of heat, pressure, and acid salts.

The patentee had also obtained patent 939,966, upon the 16th of November, 1909, for method of molding articles; patent 941,605, upon the 30th of November, 1909, for a packing material; and patent 957,137, upon the 3d of May, 1910, for a container for food products. Another application, made upon the 30th of April, 1909, and renewed upon the 21st of December, 1911, was not issued until March 5, 1912, under No. 1,019,408, for wood finishing, while patent 982,230 was issued upon the 24th of January, 1911, for a coated object and method of making the same, upon application which had been filed upon the 22d of November, 1909.

Finally, upon the 14th of March, 1911, two applications were filed for different varnishes or lacquers upon one of which a patent was issued, upon the 20th of February, 1912, under No. 1,018,385, which is the second patent in this suit, and the other under No. 1,037,719, upon the 3d of September, 1912, which is the third patent in this suit.

The defendant points out that the application for patent 949,671, which was filed on February 18, 1907, sets forth two method claims for impregnating fibrous material with a phenolic body and an alde-

hyde, and causing reaction within the fibrous material so as to yield an indurating gum or resin. In the specification the applicant refers to the reaction of ordinary phenol and formaldehyde and states that the reaction can be accelerated by the application of heat and by the presence of so-called condensing agents, as, for instance, minerals or organic acids, salts, and the like. He also states that a gum or product soluble in alcohol will be obtained if the formaldehyde be not used in excess of the molecular proportion. If the formaldehyde be in such larger proportion or in excess, a very hard and insoluble condensation product results.

The application for patent 942,699 was filed on July 13, 1907, and originally contained claims 1, 2, 3, and 9, for methods of forming a product by the reaction of a phenolic body and an aldehyde, while claims 7 and 8 cover the product produced by this method. Claims 4, 5, and 6 have to do with the process of indurating fibrous material. Claim 8 is based upon the combination, after hardening, of a fibrous material with a resinous body obtained by the reaction of a phenol and an aldehyde. This claim again sets forth that the product is characterized by its insolubility in alcohol, acetone, and like solvents and by its resistance to heat, moisture, and alkaline and acid reagents.

The specification of this latter application refers to the application just mentioned (serial No. 358,156, of February 18, 1907) which described as an accelerating or condensing agent acid or acid salts, and states that the earlier application claimed a method which would yield an insoluble indurating condensation product (gum or resin).

The inventor, on July 13, 1907, stated that he had discovered a greatly improved product by separating the bulk of the water produced during the reaction before final hardening. He says:

"If a mixture of phenol or its homologues and formaldehydes be heated, alone or in the presence of catalytic or condensing agents, the formaldehyde being present in about the molecular proportion required * * * approximately equal volumes of commercial phenol and commercial formaldehyde," these bodies will react, etc.

He then describes the treatment to obtain further reactions, and finally directs heating of the condensation product, by which it will be transformed into a hard, gummy, or resinous body, "unaffected by moisture, insoluble in alcohol and acetone, and resistant to acids, alkalies, and almost all ordinary reagents." He states:

"This product is found to be suitable for many purposes, and may be employed either alone or in admixture with other solid," etc.

In combining the condensation product in this manner, the desirable materials are mixed with the same before submitting it to the final hardening operation below described. This final hardening operation is to press it in a mold at a temperature of from 110 to 140 degrees C. for the production of hard objects similar to rubber, ivory, etc., while for treating wood the inventor says that the surface only may be treated, or that the entire body of the wood may be subjected to the treatment set forth in the earlier application (February 18, 1907) and the material thereafter submitted to heat; some condensing agent being added if desired. He specifies heating in a closed vessel and under

pressure, to turn the condensation product, whether alone or compounded, into an insoluble "resin" (later amended to read "body"). He specifies that cresol and its homologues may be used in place of ordinary phenol, and that a small proportion of mineral or organic acid, or salt favoring condensation, may be added. By a subsequent amendment he inserted the words "or agent" before the words "favoring condensation," but specified that the proportion of this condensing agent was in all cases to be so small as to avoid such energetic reaction as would not permit the intermediate oily, viscous, or semiplastic condensation product to be obtained.

The Patent Office required separation between the claims relating to the condensation product and method of producing same and the claims relating to the wood indurating product or method of production thereof, and the inventor limited that application to three claims relating to the method of obtaining the hard product by the application of heat and pressure from the condensation product of phenol and formaldehyde.

In so doing, upon the 17th of March, 1908, the inventor stated that widely differing products might be obtained from the action of phenols on aldehydes. Some of these might be liquids, others solids, some crystalline, and others amorphous masses of a resinous appearance. "These resinous products may again be divided into those which are fusible and soluble in alcohol or similar solvents, and those which are infusible and insoluble" under like conditions.

He refers to the De Laire (French) patent 361,539, and the Blumer (English) patent 12,880 of 1902, as illustrations of the fusible and soluble product, while he refers to the experiment by Kleeberg, described in 1891, as instance of an insoluble and infusible condensation product.

He also refers to Luft (United States) patent 735,278, (German) patent 140,552, (English) patent 10,218 of 1902, who uses an acid condensation agent and adds to the plastic condensation product such substances as camphor, rubber, glycerine, or alcohol, and then submits the product to slow drying or evaporation, at a temperature of 50 degrees C. He states that Story, in his (English) patent 8,875 of 1905, accomplishes the same result by using an excess of phenol. The phenol acts as a solvent, the excess separating upon boiling, and, if "poured in suitable molds" and "dried at temperatures below 100 degrees C. (about 80 degrees C.)," the excess of phenol will be expelled and an infusible product obtained.

He states that the above-mentioned processes are compelled to resort to relatively low temperatures and are slow-processes, varying from a day to several weeks or months, while for objects of large size the drying is irregular, etc.

The inventor states that his own process by the application of heat and pressure yields a superior product in a shorter time and claims invention for his method. These claims were rejected upon the Luft and Story patents, in connection with others, and were amended by emphasizing the combined action of heat and pressure as a distinction from all the references cited. An example of the claims rejected is illustrative of the inventor's disclosure, i. e.:

"The method of producing a hard, compact, insoluble, and infusible condensation product of phenol and formaldehyde, which consists in reacting upon phenol with formaldehyde under the combined action of heat and pressure."

Certain correspondence was had as to the original disclosure of the use of pressure, and the claims were again amended to meet that objection, on October 8, 1909. In this form the patent was granted upon a request presented on November 4, 1909, in which the specification and claims were rewritten. Claim 1 is as follows:

"The method of producing a hard, compact, insoluble, and infusible condensation product of phenols and formaldehyde, which consists in reacting upon a phenolic body with formaldehyde, and then converting the product into a hard, insoluble, and infusible body by the combined action of heat and pressure."

And claim 5 shows the step in the method by which a "metallic salt" is added to cause "separation."

The balance of the claims (originally 4, 5, 6, and 8) resulted in patent 942,852, also granted upon December 7, 1909, which presents nothing further, affecting the issues in this suit or the means by which the patentee disposed of the references to Luft and Story, other than the matters which have been discussed in connection with the claims relating to the first part of the application.

We thus come to the application 397,560, of patent 942,809, which was filed upon the 15th of October, 1907; that is, in the same year in which the applications just discussed were filed. In this the inventor claims improvements in the condensation product and method of making same from formaldehyde and phenol, by setting forth an improved method and an improvement in the product resulting from the use of that method. He states that these condensation products have received industrial application in the making of varnish, resinous products, and plastic compounds. He states that the completion of the product by heating phenol and formaldehyde without the aid of condensing agents requires some 8 hours when commercial phenol and formaldehyde are used, and that 48 hours constant boiling are required with crystallized phenol. He also states that acids or salts cause a stormy reaction and produce products containing undesirable impurities effecting a darkening color with age or the presence of alkalies in the ultimate product. He states that, by the addition of "proper proportions" of an organic or inorganic base, the reaction may be facilitated and the product rendered far superior. He states that the base may be added at any time up to the conclusion of the heating process, and that alkalies are used in such relatively small proportions that their presence does not interfere and that they need not be eliminated by washing or neutralizing. He mentions ammonia, caustic alkalies or their carbonates, anilin or pyridin, or the hydrates of barium, strontium, or calcium, as well as all derivatives of the type of $N H_3$ having basic properties.

The original specifications set forth that the additions of ammonia or caustic soda, in as small a proportion as one-half per cent. of the weight of phenol, show a decided influence. In most cases it is desirable to use somewhat larger proportions, rarely attaining however

10 per cent. of the phenol by weight. The inventor describes the addition of this base to pure or commercial phenol (carbolic acid) and formaldehyde, and the completion of the reaction by heating in a closed vessel or one with a return condenser, thus producing either an oily liquid or more or less viscous, elastic, or semisolid product, which is "soluble in alcohol, acetone and similar solvents, and in conjunction with these forms varnishes of excellent quality." Upon application of heat the varnish is rendered insoluble, and substantially inert to acid and alkaline reagents after drying.

The inventor furnishes examples specifying the use of 50 parts of phenol by weight, 30 to 70 parts of commercial formaldehyde by weight, and in one instance aqueous ammonia 1 to 10 parts by weight, in another, anilin 1 to 7 parts by weight, and in a third, commercial sodium or potassium hydroxide .5 to 6 parts by weight.

He then refers to previous methods (apparently known in the art) of dissolving phenol in substantially molecular proportions with caustic alkali so as to form a phenolate. Reaction of this product is caused with formaldehyde and the product neutralized by acid, leaving a solid soluble in alcohol and in caustic potash (De Laire). He states that he differs from this in not employing the large proportion of alkali, thus avoiding the necessity of neutralizing but yet giving a product capable of solution, molding, and which will be turned by the application of heat into a solid mass insoluble in the ordinary solvents.

His claims as first presented were exceedingly broad, as, for instance, proposed claim 1:

"The method which consists in reacting on a phenolic body with formaldehyde in presence of a base serving as a condensing agent."

The Patent Office immediately rejected, upon the 9th of December, 1907, on the (French) patent 361,539, of June 8, 1905. This is the so-called De Laire patent, and the inventor, upon the 17th of March, 1908, began to limit his claims to correspond with the statements of his specifications, by inserting in claim 1 the words, "the proportion of base being insufficient for the transformation of the phenolic body into phenolate." He explains that his original specifications made it clear that the De Laire patent was understood and that it was intended to distinguish his invention therefrom.

The Patent Office thereupon allowed the patent upon the 25th day of May, 1908, but upon the same day the case was withdrawn from issue, and a further amendment, not affecting the merits, was asked upon the 17th of September, 1909. A further definite statement of the amount of base was inserted in the claims by substituting the words, "less than one-fifth of the amount of," in the place of the words "the phenolic."

This amendment was rejected on September 27, 1909, on the (German) patent to Henschke, 157,553, which was explained by the inventor upon the 7th of October, to cover a product in the form of aqueous liquid, soluble in water, capable of liberating formaldehyde, having disinfecting properties, in fact being an alkaline derivative of saliretin.

It also appeared at this time that claims 9 and 10 specifically related to a varnish rather than a mere condensation product, and the other claims were allowed on December 7, 1909. Then by division of this application, on a petition filed November 22, 1909, under No. 529,378, but upon the same disclosures in the specifications, the original claims 9 and 10 were allowed on April 12, 1910, for a varnish, No. 954,666 (the first patent in suit). These claims had been again rejected on Henschke (supra). A third claim was also rejected on Lüft (British) 10,218 of 1902, and Grognot (French) 906,219 of 1908.

The inventor repeated his explanation as to the Henschke patent and amplified it by stating that Henschke removes the free base by acidification and thus obtains a precipitate free from base and soluble in alcohol, acetone, alkali, ammonia, etc. The final product of Henschke is either an antiseptic powder, or a substance liberating formaldehyde available as a disinfectant.

All that the Henschke patent really shows with respect to the issue in this action is that the reaction between phenol and formaldehyde will be effected by the presence of a base in certain specified amounts which differ in quantity from the amounts used by Manasse, Lederer, Kleeberg, and others.

The Patent Office quickly recognized the distinction claimed by Backeland, and, as the examiner seemed to have no question that a product such as that described in the application could be patented, the claims were then allowed and the first patent in suit issued, describing a substance or product, possessing alleged new and useful qualities, and available generally for the purposes which have been covered by the term "varnish." This condensation product was formed with heat alone at relatively low temperatures. The expert witnesses in this case have defined a "varnish" as:

"A liquid adapted to be spread in a uniform layer on a surface and which will there set to produce a hard, permanent, nonporous, protective, continuous, adherent, and coherent layer or film."

This film should also be smooth, shiny, transparent (unless made a medium for adding coloring material), and made from materials obtainable at such prices and in such quantities as would allow the manufacturer to put the product upon the market, to meet the needs of the trade in price and convenience of supply. Ordinary varnishes were said to be divided between those made from vegetable gum and those made from pyroxylin. But neither of these classes included the reactive varnish films.

[3] "Pyroxylin," which is nitrocellulose or gun cotton, if dissolved and spread as a varnish film, is subject only to the evaporation of the solvent, a physical or nonreactive change. Vegetable gums undergo no change other than the evaporation of the water when spread in a varnish.

[4] A "reactive film" is one in which a chemical change or reaction occurs upon spreading the film and subjecting it to heat, light, air, motion, or electricity, but without the addition of some other chemical substance. The plaintiff's product when subjected to heat,

after having been spread in the form of a varnish film, expels water and gaseous products, and the stage of insolubility and infusibility is not reached until the chemical reaction just referred to has taken place.

In vegetable or pyroxylin varnishes, mere heating or drying will leave a product capable of re-solution as many times as the process is repeated. The use of such varnishes in commercial practice, where excellence of product and quickness of hardening entered into the desirability of the article, led the inventor to construct an oven or drying apparatus, by which the requisite amount of heat, or heat under pressure, could be used so as to shorten the drying or reacting stage, and to consider the then known requisites and limitations or difficulties which necessarily had to be taken into account in attempting to use any varnish or article successfully for commercial purposes. The formation and forcible expulsion of water during the reaction and under the influence of heat was theoretically sufficient to remove from the varnished surface moisture that might interfere with the dialectric or insulating quality of the varnish film in coating or covering surfaces of electrical conductors or nonconductors. In practice, it developed that some of the water generated was retained and not physically expelled from the surface of the varnish, under the influence of sufficient heat to remove the solvent and complete the reaction producing the insoluble and infusible product.

The idea of a double solvent was well known in the arts as well as in chemistry. The patentee, after experimenting with different solvents, and observing the reactions and effects connected with their use, found that by employing a double solvent for the solution of the product, described in the first patent in suit, in which double solvent, one of the bodies possessed the characteristics of amyl alcohol, toluene, or xylene (having boiling points above that of water), and the other body such as wood alcohol, ethyl alcohol, or acetone (having boiling points below that of water) would produce a varnish compound in which the reaction set in motion by the application of heat, would expel substantially all of the water before the boiling point of the amyl alcohol, toluene, or xylene was reached. As these last-named bodies were practically immiscible with water, and were volatile when heated at atmospheric pressures, the application of the double solvent can be readily understood. This product was also free (under the reaction caused by heat) from the tendency of the alcohols to absorb moisture and thus to produce a white or inferior coating when subjected to damp weather, and by this method the tendency of free phenol and free cresol to absorb water was also eliminated by the certainty with which such water was expelled, until a point was reached where the free cresol and free phenol would be (if not already counteracted) volatilized or driven off by the heat.

The second patent is, again, a product patent as distinguished from a method or process patent. In the Patent Office the Story (British) patent 8,875, of 1905, was cited as disclosing the addition of certain fatty oils to a condensation product of phenols and formaldehyde. But in Story the presence of an excess of uncombined phenol, with the

consequent difficulty when heating the substance containing the fatty oils described, caused by their tendency to decompose before they become volatile, and before the excess phenol would be removed, together with the fact that Story uses the fatty oils to make the mass opaque, satisfied the only objection presented, and the Patent Office allowed the patent as a new composition of matter. This patent has six claims, of which 2 and 5 are typical and are as follows:

"2. As a new composition of matter, a varnish comprising a condensation product of phenols and formaldehyde and a solvent therefor, said solvent containing amyl alcohol and a readily volatile organic liquid."

"5. As a new composition of matter, a varnish comprising a condensation product of phenols and formaldehyde and a solvent therefor, said solvent containing a readily volatile organic liquid, and another organic liquid which is immiscible with water but miscible with said solvent, which is volatilizable without decomposition when heated at atmospheric pressures, and of which the boiling point exceeds that of water."

These claims are those alleged to be infringed.

But in a short time the difficulties shown in electrical insulations from the tendency of alcohols to absorb moisture, the desirability of using benzol as a solvent when an excess amount of phenol or cresol might remain, and from the further fact that the condensation product after the reaction caused by the application of heat was insoluble in benzol (or in moderate amounts of alcohol unless a large excess of phenol was present), led the inventor to use, as one solvent, benzol or other cyclic hydrocarbon (easily obtainable from petroleum, such as petroleum ether, toluol, xylol, etc.), and, for the other solvent, any liquid oxygen compound of the aliphatic series, such as methyl or ethyl alcohol, amyl alcohol, acetone, amyl acetate, epichlorhydrin, etc. If a large amount of alcohol was used as a solvent, reprecipitation was likely, but benzol prevented this result.

While this method of using a double solvent was particularly directed to the production of the solution, i. e., a varnish from which the uncombined phenol had been expelled, it could also be advantageously used in any case where the excess of the phenol was not great enough to render the final or condensation product freely soluble in benzol or alcohol alone.

This application in the Patent Office brought forth the statement that the solvents mentioned are "common in the art," and the Smith (German) patent 112,685 was cited as disclosing a mixture of benzol and ether as a solvent; but this was explained by showing, from the translation referred to in the Smith patent, that a permanently fusible substance was under description, made from aldehyde or acetaldehyde (not formaldehyde) in presence of hydrochloric acid. The patent was then immediately issued, containing claims for the product as a new composition of matter. Claims 1, 2, and 3 are alleged to be infringed, and are as follows:

"1. As a new composition of matter, a varnish comprising a condensation product of phenols and formaldehyde, transformable by heat into an infusible body and a solvent therefor, said solvent containing a liquid oxygen-compound of the aliphatic series, and a hydrocarbon.

"2. As a new composition of matter, a varnish comprising a condensation product of phenols and formaldehyde, transformable by heat into an infusible

body and a solvent therefor, said solvent containing a liquid oxygen-compound of the aliphatic series, and a cyclic hydrocarbon.

"3. As a new composition of matter, a varnish comprising a condensation product of phenols and formaldehyde, transformable by heat into an infusible body and a solvent therefor, said solvent containing a liquid oxygen-compound of the aliphatic series, and a hydrocarbon of the benzol series."

It may thus be seen that Dr. Baekeland, in patent 942,699, secured claims for a product produced by the method set forth in the application filed July 13, 1907, and in the first patent in suit obtained claims for a varnish composed of substances, one of which was the product shown in patent 942,700 and patent 942,809, but limited by the amount of base remaining in the final product that is persisting into or after the application of heat. The substances entering into the reaction are the basis of estimating the result, rather than the quantity present and expelled or accounted for in some other way; but these excess quantities not entering into the reaction must be considered, as for instance the excess of phenol in the novolak products and the excess of formaldehyde in Henschke.

As has been mentioned in the reference to the file wrappers above, the general proposition, that a varnish could be made by the use of condensation products, was well known and disclosed in substantially each of the patents which have been described.

It was plainly old in the art to make pyroxylin varnishes and varnishes of phenolic condensation products. But each of these varnishes, and each condensation product, had individual characteristics, and the patents in suit involve differences in the chemical process or processes of manufacture by which the particular product, claimed in the patent as novel, is to be produced.

The defendant claims that this product, to be used in the making of varnish, was nothing more than the resin which the patentee had sought to patent for use as a varnish, and he urges therefore that the varnish patents themselves are invalid, citing Underwood v. Gerber, 149 U. S. 224, 13 Sup. Ct. 854, 37 L. Ed. 710.

He attacks further claim 1, because the patentee is said to have acquiesced in the rejection by the Patent Office of this claim when first presented.

The application for patent 942,809, which was a renewal of application 397,560, contained the claim filed upon the 15th of October, 1907, for a varnish, and the defense claims that the rejection of the varnish claims in the condensation product patent was acquiesced in by Baekeland, and that he therefore could not divide the application and restate the claim.

Examination of the file wrapper shows that this rejection was merely because of the incompatibility, under the rules of the Patent Office, of a claim for a varnish in the same patent with a claim for the condensation product with which the varnish is to be made, or a claim for the method of making that product.

Claim 2 is said to be invalid, in that the specifications as originally presented, and even as finally contained in the allowed patent, do not show the rule of proportion set forth in the language "not exceeding

one-fifth of the equal molecular proportion of phenol body employed." During the trial much testimony was devoted to an explanation of the meaning of "equal molecular proportion" and computation of the amount of ingredients set forth in the various patents discussed in the record.

Inasmuch as there is no dispute as to the real meaning of the phrase, or as to the molecular weight of the ingredients, or as to the quantity represented by one-fifth of the phenolic body expressed in terms of molecular weight, and so long as there is no dispute as to the percentage of the whole article represented thereby, we need only look to the specifications in order to find if the language of this claim corresponds to a proposition explained in the specifications.

The patentee, when referring to the use of base, and speaking of ammonia or caustic soda as an illustration, says that so small a proportion of the base as one-half per cent. of the weight of phenol, that is $1/200$ by weight, and in other cases an increased amount rarely reaching 10 per cent. by weight of the phenol, is sufficient. This base is, however, to be calculated from that which actually remains as such in the product or the varnish, and the definite proportion contained in the claim was inserted therein after the Patent Office compelled the patentee to limit his claim of invention (but not the statement of his original experimentation or his present conclusion) to matters which the Patent Office considered new over the De Laire, Story, and Luft patents.

Under these circumstances, the court cannot see why the claims should be invalid because at the time of filing the application the patentee did not sufficiently limit the language in his claims so as to avoid interference with other patents which, however, did not disclose the precise matter ultimately proving to be that intended to be claimed as invention by the applicant, and which had been in his mind from the time of his application. Thus the small amount of base which Dr. Baekeland finds would universally produce the result desired was not disclosed by any of the prior patents, up to the time the application by Baekeland was filed.

Subsequently a certificate of addition to the Story (French) patent was filed upon the 29th day of September, 1908, and therefrom the defendant suggests that Baekeland learned how to state the claim which he had previously been trying to formulate. But the question of patentability could not rest upon literary plagiarism even if that were shown, and the testimony in the case would indicate rather that the Story addition was an attempt to secure the French rights for the same variation from the original Story patent as were being claimed by Baekeland in the United States, even if there were reason to suppose that Baekeland had seen this addition to the Story (French) patent, which was not published until February 25, 1909.

This would not prove that Story was entitled to claim the invention over that claimed by Baekeland, and, if Baekeland's invention was in fact the same as that described in the Story addition, then Baekeland would be entitled, on application to the Patent Office, to

have the claim issued even in substantially the same language as that described by Story.

The defendant does not show that Story was the inventor rather than Baekeland; he merely suggests that Story's patent solicitor produced a statement of the claim in such a form that Baekeland could see at once that, stated in the same way, his invention was made valid over the prior art and would meet with the approval of the Patent Office.

But, as a matter of fact, the defense does not even make out its accusation of plagiarism, as there is nothing to show that Dr. Baekeland had the Story addition before him or called to his knowledge prior to the time when he realized the way in which to make a definite statement of what he claimed as novel in his patent over the Story or De Laire patents themselves.

The defense to the second and third patents is substantially the same as that to the first, but with the added proposition that double solvents were old in the art and that the particular double solvents claimed in the third patent were in fact but a variety of those shown in the second.

As to the last proposition which is urged (that benzol or toluol with amyl alcohol would be one of the possible components referred to in the second patent, when it suggests the use of a solvent, immiscible with water and having a boiling point higher than that of water, with one of the easily volatile solvents at lower temperatures), the defendant's claim is that thereby the patentee attempts double patenting or extension of the time of protection beyond that shown by the second patent. But even though the third patent should be held to cover nothing more than one of the components disclosed by the second patent, and if the third patent should therefore be void for anything more than the period protected by the second, the defendant herein would still be an infringer of the second patent and liable.

As a matter of fact, however, the third patent is not invalid in this sense. The second patent does not teach nor show the combination of a hydrocarbon with a solvent of the aliphatic series, having the qualities of and volatilizing at the temperatures described. The testimony of the expert varnish makers in the case shows that the use of these two particular solvents would be not only an accident, but substantially improbable except as a casual experiment, and the precise nature of the product covered by the third patent is shown therein to be adapted for a particular use, and would seem to be a patentable improvement over the combination described in patent No. 2.

We come back, therefore, to the main defenses based upon the prior art.

The defendant attempted to show noninfringement upon his own testimony that he added no base to the commercial carbolic acid and the commercial formaldehyde solution which he employs in making his varnish. But analyses by both the defendant's and plaintiff's experts showed the presence of ammonia by what is called the Kjeldahl method, which shows the quantity of nitrogen and accounts for

any ammonia that may have been present as a part of this nitrogenous body.

By another analysis, the plaintiff's expert, whose results compared generally closely to similar analyses by the defendant's expert, found free ammonia amounting to $13/100$ per cent. of the solid residue. The defendant's expert failed to take into account the combination of ammonia and formaldehyde to form hexamethylenetetramine, a nonvolatile base from which ammonia would not be driven off by boiling with caustic soda.

The analyses further showed that the defendant's products contained pure phenol and ammonia, and the testimony of the case shows definitely that ammonia is not found in commercial carbolic acid. But orthocresol, metacresol, and paracresol, as well as pyridin, are found in commercial carbolic acid. Pyridin shows by the Nessler test no trace of ammonia, and yet would give by the Kjeldahl test evidence of the presence of nitrogen. Likewise by the Kjeldahl method, ammonia would be found and be calculated as nitrogen.

Commercial carbolic acid is mostly cresol, with possibly a small amount of true phenol. As true phenol or hydroxybenzol reacts more easily with formaldehyde than does paracresol or orthocresol, the fact that free phenol is found in the defendant's varnish, and that no cresols were found, would indicate that the defendant's varnish was made from phenol rather than commercial carbolic acid, and that the ammonia present must have been in some form added as a base.

While the defendant has testified to certain purchases of commercial carbolic acid, and also certain purchases of crystalline phenol, he has not testified to the use of any material which would satisfactorily account for the product shown by analysis, and it must be held that he is either making a product which infringes the plaintiff's patent, and has not disclosed the methods of so doing, or that he has added some material of which he does not know the contents himself, but which contains products that do infringe the patent.

[2] It is no defense to a charge of infringement of a patent for a product produced by some chemical process, to assert ignorance of the reactions which take place, and thus to claim the right to combine substances which on analysis are shown to cause the reactions of the process leading to the patented product, and to obtain that product itself by methods shown to be those of the patent, even though never before understood until testified to upon the trial.

If a person should attempt to excuse infringement of a patent calling for the use of iron or steel in the making of a device, by suggesting that he did not know what iron or steel was, and that he merely used a hard metallic substance which he purchased from a certain manufacturer and which did the work, it can be seen where such a doctrine would lead.

The defendant also contends that the amount of base shown by the defendant's chemist is much less than the smallest amount stated in the plaintiff's patent to be sufficient to meet the discovery therein contained. But the plaintiff's expert finds ammonia approximating

$^{13}/_{100}$ per cent. of the solid residue which is within the quantity referred to in the specification.

Much of the discussion raised by the defendant with reference to the validity of the patent, both from the standpoint of the disclosures in the plaintiff's former applications and patents and also in following up the suggestions of the patents of the prior art, arises from the nature of the claims and of the invention.

It will, of course, be assumed that no chemical reaction can be patented as such. A natural product, such as ordinary salt (Na Cl), could not be made the basis of a patent, nor could a discovery of the chemical reactions by which salt was formed in nature, from sodium and chlorine, be patented as a process. But if artificial salt, as a chemical substance, could be distinguished from natural salt, and if some one discovered a way to make artificial salt, he could patent the method or process, if it were novel. Provided he was the first one to produce the substance, he could patent the product as something useful in commerce or in the arts.

So it is conceivable that some gum or natural substance like shellac or amber might be found, composed of phenol, formaldehyde, and a base, and transformed by heat into an insoluble and infusible substance. If such a product had been known prior to the plaintiff's patents, the plaintiff could have obtained no patent, if his product was identical and indistinguishable from the natural substance; but he would have been limited to a patent for a process.

But at a time when the only product of phenol and formaldehyde, known and described with understanding and definiteness, was a permanently fusible and permanently soluble gum, the discovery of a method of rendering this product insoluble and infusible was patentable, and provided the product could be certainly identified and distinguished from the former and known products, it could be patented as well as a combination of such substance in certain relations or proportions.

If the use of an excess of formaldehyde was overcome by the use of a large amount of base, and the base in turn removed by precipitation into an acid salt, and if the product was not identifiable or was not available for any known purpose, no patent could be issued for the process (which would be mere chemical reactions) nor for the product (see Reychler and Kleeberg), and certainly the combination of that product with some other substances to form a useful article like a varnish, is inconceivable.

The patents in suit are based upon the earlier patents of Baekeland for a method of producing the phenolic gum and also his patents for the condensation product produced by the patented method. But when he attempts to make a varnish which consists of a combination based upon and making use of the patentable method of preparing the condensation product, and also upon the patentable substance itself he has a new substance which is itself patentable. As in the case of a patentable mechanical device, this consists of more than a mere aggregation of parts.

Considering the last two patents in suit for a moment, the defendant claims that they are invalid because they show merely the use of a double solvent with a gum or product which is capable of solution for varnish purposes, which is nothing more than the ordinary defense of aggregation with respect to a combination of mechanical parts. If the use of these solvents with this particular phenolic gum presents a substance having qualities that are different from those of any other compound or substance previously used for the same purpose, it is no defense to the patent to suggest that the physical or chemical processes involved in the mixing and drying or setting of the varnish are the same as those involved in the mixing, drying, or setting of a varnish which would produce different results and show different qualities.

The combination disclosed in the Backeland patents is new for varnish purposes. It has new qualities, and meets old needs in a new way. The behavior and purposes of the double solvents, and the way in which the varnish passes through the physical and chemical changes, are of course not patentable, any more than the suggestion that the water present is eliminated in the form of vapor would be novel or distinguish the product from other substances. If, however, water or volatile solvents are evaporated, the patentability of the combination from which the water is produced would not be affected by the age of the world's appreciation of the principle of evaporation.

So with the first patent in suit, when we consider the various patents of the prior art by which condensation products, showing either an excess of phenol or an excess of formaldehyde, or condensation by the aid of a large amount of base, or by the acidification of the base and its removal in the form of nonsoluble salts, or if we consider the possibility of obtaining a huge mass of insoluble and infusible material, of irregular shape, by a violent expulsion of steam or gas and a consequent spongy or porous form of the product, or if we consider the production of an insoluble and infusible film in small quantities upon a glass plate or in a test tube, or even if we found the product such as was shown in the Story (English) patent, where by long application of heat a reddish or red-colored film could be produced, or if we consider a condensation product which, while capable of use as a varnish, remains permanently fusible and soluble (such as that distinguished by the novolak type), we nowhere approach to the particular condensation product and the particular combination, for use as a varnish, by which it is possible to certainly, easily, and accurately begin with a condensation product that in combination with certain defined solvents will produce a varnish which with short subjection to moderate heat will produce a colorless, infusible, insoluble, and useful lacquer film of the sort desired for use in the arts and which in certain definitely specified combinations possesses the qualities required where the surface is to be subjected to the influence of an electric current, under conditions where moisture may be absorbed or encountered.

It is unnecessary to go through the patents presented in the prior art in detail. The chart prepared by the plaintiff, and which is shown

below, contains references by number to all of the patents, and indicates the direction of the various reactions and the classification of the products upon the basis of those reactions in each patent mentioned:

GENERAL BAKELITE CO. V. NIKOLAS     559

It is sufficient to say that in none of the earlier Baekeland patents was a varnish combination disclosed which was like that in the patents in suit, even though Baekeland in some of the earlier patents taught that his particular condensation product was available as a varnish. Nor did any of the earlier Baekeland patents or the patents of the prior art shown in circles 2 and 3 produce the infusible and insoluble substance of the Baekeland patents shown in circles 11 and 13.

The Story (English) patent, as has been seen, presented an acid, rather than a basic condensation product. In cases where pure phenol was used, a large amount of heat or long evaporation was necessary to produce the insoluble or infusible film with the reddish tinge, while the product that Story considered available for varnish purposes was that containing the acid excess and which remains soluble after drying as a varnish.

Such other patents as those set forth in class 15 upon the diagram present nonphenolic or nonreactive varnishes or resins which have nothing to do with the combinations of the patents in suit, except as they may use double solvents or may set forth similar chemical reactions, or may, with the knowledge of those patents, as well as of the Baekeland patents, indicate how an exchange of 'substance might, by employment of the same chemical reactions as before, produce the Baekeland results. But such patents are not anticipations, nor would they be infringements of the Baekeland patents in suit, and we can therefore dismiss them, as in each case they were substantially dismissed by the defendant's expert upon the trial, by saying that no one of them showed in its entirety the precise varnish or combination of any of the three patents in suit. Even if it does not require invention to trace the resemblances between these patents and the Baekeland patents in suit, or to produce similar results by substitution of known products for those products which were different in these prior art patents, and even if we do not concede to the defendant's expert invention in tracing the points of resemblance and difference, it is evident that his recognition of these points does not raise them to the dignity of defenses, nor are they anticipations of the Baekeland patents.

The doctrine of Underwood v. Gerber, supra, is presented as authority for the claim of invalidity as to the patents in suit, because it is said that in patent 942,809 Baekeland disclosed the same form of varnish resin, and that no patentable novelty is shown in merely combining that resin with a solvent to make a varnish.

The discussion already had shows the difference between the case at bar and Underwood v. Gerber, supra, where a patented or claimed product was subsequently used as an application for the surfacing of paper. But the discussion already had shows further that patent 942,-809 describes merely the process or method of producing a patentable substance, while claim 8 describes this condensation in such general form that the description in patent 954,666, of a varnish made therewith, would still be possible as a combination, even though Dr. Baekeland might not be able to patent a second time the condensation product produced by the presence of a base condensing agent in proportions not to exceed one-fifth of the equal molecular proportion of phenolic

body employed after describing that condensation product in his previous patent, 942,809, for which the application was that from which the new application was divided and re-filed.

The first patent in suit was based upon the application for 942,809, was never abandoned, and was not anticipated by the subsequent separate allowance of 942,809 for one of the ingredients of the new and patentable substance which was useful commercially as a varnish.

Claim 2 of patent 954,666 is therefore valid as the definite description of the combination specifically based upon the product patented in 942,809, while claim 1 of patent 954,666 is valid as a general description of a new form of varnish which can be produced by the methods of the specification and which is in more detail identified in claim 2.

The patents will therefore be held valid and infringed, and the plaintiff may have a decree.