## GENERAL BAKELITE CO. v. GENERAL INSULATE CO.

(District Court, E. D. New York. July 31, 1921.)

1. **Patents ⬡⟶328—For methods of making synthetic gums or resins valid and infringed.**
   The Baekeland patents, No. 942,699, claims 1, 2, and 4, No. 942,852, claims 5 and 6, and No. 939,966, claims 1, 2, and 3, relating to processes for producing an infusible and insoluble material as a condensation product of the chemical union of phenol and formaldehyde, and the products of such processes, which material when molded or formed is used for insulating and many other purposes, held valid and infringed.

2. **Patents ⬡⟶165—No broader than claims.**
   A patent can be valid for no more than is covered by the claims of that patent.

3. **Patents ⬡⟶167(1), 170—Claims limited by disclosure and prior art.**
   The claims of a patent, when limited by the disclosure of the specifications and by the condition of the prior art, may be valid, even though the language of the claims be so broad as to cover other matters, if viewed out of their proper context.

4. **Patents ⬡⟶168(1)—Procedure in Patent Office may limit claims.**
   The procedure in the Patent Office and the acts of the patentee with respect thereto may be used in determining limitations on his claims and in discovering the precise meaning of a claim as allowed.

5. **Patents ⬡⟶168(2)—To determine state of art, disallowed claims may be looked to.**
   The claims of a patentee which are disallowed, and the extent of acceptance of the ruling will frequently show what point the prior art had disclosed to the examiner and the patentee, and in this way create a limitation of possible broad language in the claims or indefiniteness in the specifications.

6. **Patents ⬡⟶160—File wrapper may be resorted to.**
   The file wrapper in a patent application may be resorted to, in order to throw contemporary light on the development of the prior art, and to determine whether or not the patentee has attempted to enlarge his claims, or to modify the scope of his invention as subsequent discoveries come to the notice of the patentee.

7. **Patents ⬡⟶157(2)—Claims construed narrowly to give validity.**
   Patent claims, if ambiguous, or capable of a broad and a narrow meaning, should be construed narrowly, if they may thereby be held valid, and a broad interpretation should not be used if the result is to cause invalidity.

8. **Patents ⬡⟶66, 120—Separate patents may be secured for process and the product, and one does not anticipate the other.**
   If applications for process and its product are copending, separate patents may issue therefor. The earlier patent issued is not an anticipation of the other.

In Equity. Suit by the General Bakelite Company against the General Insulate Company. Decree for complainant.

Charles Neave, of New York City, C. P. Townsend, of Washington, D. C. (Maxwell Barus, of New York City, of counsel), for plaintiff.

⬡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill., and Messimer & Austin, of New York City (John H. Lee, of Chicago, Ill., and J. Edgar Bull, of New York City, of counsel), for defendant.

CHATFIELD, District Judge. The plaintiff is the assignee of a number of patents granted to Leo H. Baekeland, on applications filed from February 18, 1907, until the 13th of December, 1910. Patents were issued on these applications at various times, beginning November 16, 1909 (No. 939,966, one of the patents in suit), and continuing until June 13, 1916.

[1] These patents have, as the foundation for their existence, the production of a synthetic material from the chemical union of carbolic acid and formaldehyde. The term "carbolic acid" is the common or trade name of certain phenolic bodies in liquid form. The chemical substances used in making the synthetic material above referred to embrace a number of these phenolic bodies, including phenols, cresols, and xylenols. The term "formaldehyde" embraces different compounds of methylene groups, and the reaction product takes, as the first separable form, a viscous or plastic semisolid gum, which, upon concentrating or drying after separation from the liquid of the reaction, hardens to resemble, in superficial respects, natural gums or resins of the types commonly familiar and called shellac or copal.

By certain processes, which need not now be described, these gumlike synthetic substances can be made transparent with high refractive indices and resembling glass. Some of the substances produced resemble, and can be worked as, amber. Again, these substances can be given certain colors and hues from the pigments with which they have been mixed, and they can be mingled, at the proper stage of preparation, with suitable pulverized solids or fillers, in order to produce materials for many purposes in the arts and commercial trades.

The processes, including certain of the materials obtained by some of these processes and certain improvements in producing the desired results, are the subject of the series of Baekeland patents above referred to.

The defendant is a commercial manufacturing concern, which purchases synthetic material in the forms of comminuted powder, or hard, brittle sheets. In both forms the synthetic material is, in commercial work, combined physically with certain fillers, coloring matter, and binding material, the precise purpose, preparation, and composition of each of which will be discussed and stated more fully in taking up the patents in detail.

The defendant company has been in business for a number of years. It and its officers have had long experience in placing upon the market molded or pressed objects composed of some soluble, fusible, and generally inflammable natural gum mixed with coloring material, fillers such as pulverized rotten stone or earth, and binding materials of various sorts, like asbestos or wood fiber.

These products turned out by the defendant company resemble what is known as hard rubber. Their color has ordinarily been black, like the color of hard rubber, but the possibility of giving any desired

color is easily understood and has been well known. The materials used by the defendant company have been prepared by pulverizing in the ordinary type of machine sold for such purposes, i. e., grinding mills, like those used in the preparation of other materials. Differential rolls have been employed, in order to prepare the sheets of material for further comminution or to mix and prepare the mass for treatment in the molds intended to be used.

The defendant company and others in the trade have used and well understood the principles of heating the appropriate materials in order to render them more plastic or easily molded, to make them more fusible, so as to set or solidify upon cooling, or even to be welded at the proper temperature, and thus united into a solid body.

In dealing with natural gums, in which the required temperature must be limited so as to prevent combustion or stickiness, the practice of molding has been to heat the substance or the molds to the point desired, and, as soon as the requisite pressure has been applied, to cool by water or other means the mold and the contents until contraction occurs and the mold can be safely discharged of its hardened product.

The defendant company uses, in a similar way, differential rollers in preparing material from synthetic gums. It grinds the material, when that is necessary, in a similar sort of grinding mill. It adds colors and filling materials, and mixes them by stirring and by the use of the differential rolls, in the way in which this mixing would occur with the natural gums. It uses heat to obtain plasticity and to make the various substances fusible when pressed in a mold. It thus gives the shape or design of the mold to the materials, and it discharges the molded objects from the mold, after some cooling. But the hardening process and the shrinkage, which allows the object to be freely discharged from the mold, are not, in the case of the synthetic gums, attributable to the lowering of the temperature and the setting of substances which would again become fluid if the temperature were sufficiently raised.

It thus appears that the defendant must meet, upon the merits, the charge that in manufacturing articles for the market from synthetic gum, it is infringing upon the patents, if those patents are valid, which in terms secure to the plaintiff the right to control the manufacture of articles from these synthetic gums, by methods described and claimed in the patents, and that it is infringing the patents protecting the processes or methods involved in the manufacture of such articles, if these patents be held valid, and if they are broad enough in their valid claims to cover the uses, by the defendant, above referred to.

As has been stated, the defendant makes use of synthetic gums in the production of its commercial articles. It obtains these synthetic gums from an entirely independent concern known as the Redmanol Company, having its place of business in Chicago, Ill., and having no authorized representative and no office within the Eastern district of New York.

The trial of the present action has necessarily brought into the case consideration of the nature of this synthetic product furnished by the Redmanol Company. The record shows that in fact the Redmanol

Company has stood behind the defendant in the trial of this action, and in so far as investigation of the prior art and discussion of questions of patentability are concerned, the Redmanol Company has as freely and fully presented its evidence as if the action had been against the Redmanol Company, for infringement of the plaintiff's patents, in the manufacture of the synthetic gum itself.

There has been some discussion in the record between the plaintiff and the Redmanol Company, with respect to the bringing of an action charging infringement against the Redmanol Company; but in so far as the present suit is concerned, the Redmanol Company, as such, is not a party. The defendant is charged only with violation of those particular patents which the plaintiff claims cover the operations and process of molding these synthetic materials, as performed by the defendant, and we must carefully keep in mind this limitation of the actual issues in the case, while considering broadly the defenses of nonvalidity and lack of invention which are urged substantially against all of the plaintiff's patents, but more particularly and with direct application against those of the plaintiff's patents which are involved in this action.

The defendant claims these substances to be but substances of the prior art, that is, substances which any one has the right to use in the way necessary in molding, if their original manufacture does not render the manufacturer liable to a charge of infringement. On the last point, the defendant insists that it is not guilty even of contributory infringement, since the Redmanol Company, while the object of attack, is not a party to the present action, and the method of preparing the material sold to the defendant is claimed by the plaintiff to be immaterial to the issue.

Before reciting the plaintiff's various patents and the patents in suit, a short reference to the prior art will simplify consideration and save repetition.

As early as 1872, the formation of synthetic material by the reaction of formaldehydes and phenols upon each other was known and discussed in the publications by Ad. Bayer and his pupils. Long before this, the preparation and vulcanizing of rubber from a natural gum had been discovered (Goodyear patents, 3,633 of June 15, 1841, and 8,075 of May 6, 1851), and many products of rubber were on the market in which coloring materials and fillers had been used.

It was well known that during the vulcanizing process under pressure chemical reactions or changes took place in the rubber, both because of the sulphur introduced and because of the composition of the coloring matter of the fillers themselves. It was known that rubber, when vulcanized with heat and pressure, swelled, even when setting, and that the molds in which hard rubber materials were formed could not therefore be cooled and the objects released before the entire process of vulcanizing had been completed.

In the years after 1872, various processes had been discovered and articles placed upon the market, by means of the reactions upon cellulose or cellular material by acids, and these substances, by a combina-

tion with gum camphor, produced what is known as celluloid. This material possesses great flexibility and high degree of hardness and can easily be molded with coloring matter and fillers for the making of commercial objects. But celluloid is inflammable, splits easily, is more or less brittle, and is not suitable for use in the electric arts. The great developments in the use of electricity, and a rise in price of camphor at the time of the Russo-Japanese War, are stated as the impelling circumstances which led the plaintiff to investigate the use of phenolic condensation products as a substitute for celluloid in various applications.

The testimony shows that the plaintiff was a man of broad chemical knowledge and experience, who, while born in Belgium and educated there, had studied in France and Germany and was familiar with the languages and the patent literature of those countries, as well as of England and of the United States, to a large extent. He had emigrated to the United States and had done considerable work in this country in chemical research and commercial pursuits, particularly in the matter of film coatings for photographic purposes. This work was to an extent of a kindred nature with the subject of synthetic compounds such as we have now under consideration. He had also had experience in the obtaining of patents, and these facts all enter into the amount of understanding and appreciation which must be presumed in considering the meaning of various acts on his part, when obtaining the patents in suit as well as the other patents issued to him, and of the formation, amendment, and scope of the claims which were ultimately allowed upon his various applications to the Patent Office.

[2-5] A patent can be valid for no more than is covered by the claims of that patent. The claims of a patent may be limited by the disclosure of the specifications and by the condition of the prior art, even though the language of the claims be so broad as to cover other matters and hence to be invalid if not plainly directed at a valid concept. The procedure in the Patent Office and the acts of the patentee with respect thereto may be used in determining limitations upon his claims and in discovering the precise meaning of a claim as allowed, with the resultant acquiescence by the patentee. By contrast, the claims of the patentee which are disallowed, and the extent of acceptance of the ruling will frequently show what point the prior art had disclosed to the examiner and the patentee, and in this way create a limitation of possible broad language in the claims or indefiniteness in the specifications.

[6] Frequently, also, the file wrapper in a patent application may be resorted to in order to throw contemporary light upon the development of the prior art, and to determine whether or not the patentee has attempted to enlarge his claims or to modify the scope of his invention, as subsequent discoveries come to the notice of the patentee.

[7] Having in mind the proposition that patent claims, if ambiguous or capable of a broad and a narrow meaning, should be construed narrowly, if they may thereby be held valid, and that a broad interpretation should not be used if the result is to cause invalidity, it follows that unless estopped by the contents of the file wrapper, the patentee is entitled to assert that he intended to claim only patentable novelty, and

that he did not expect to render his patent invalid by covering, in general language, what manifestly was part of the prior art. Thus many patents can be held valid, and frequently are not infringed, which would, if construed broadly enough to cover infringement, be evidently invalid upon the prior art.

In the present case, no patent has been cited directly as an anticipation. The prior art contains few patents for synthetic phenolic condensation products, and even though the plaintiff's patents should be construed so broadly as to bring in doubt their validity, as inventions over the prior art, still no one of the prior art patents is exactly an anticipation of the subject-matter which evidently was the invention of the plaintiff's assignor in the particular patent.

It is unnecessary to cite the many patents from the prior art relating to the subjects of molding and hot pressing various materials, whether to form the molded object by cooling or to cause chemical change under heat and pressure. Nor is there need of citing from the prior art the many patents in which inventors have attempted to protect particular formulas of compositions for so-called artificial or imitation ivory, ebonite, amber, and similar substances for use in the manufacture of billiard balls, doorknobs, buttons, electrical apparatus, etc. These patents show novel physical combinations or substitutes for substances, whose use, when pressed cold or hot, was obvious, or they teach various chemical and physical aggregations to imitate natural products or to provide varnish, insulation, or solids of elastic and other qualities. They taught nothing as to the creation of synthetic condensation products, and left the prior art with mere knowledge of melting, dissolving, solidifying, pressing, turning, boring, polishing, and cutting materials, which proved the demand for substances which were never thought of until phenolic condensation products were discovered. To guess that the new substitute material could be used as a substitute, or that similar uses were desirable, was not invention. But to find how to make the substitution successfully was invention, and so was the discovery of methods solving the difficulties encountered.

When we consider the prior art patents for the making of synthetic compounds of phenols with formaldehyde, more careful consideration of the patents is necessary.

The earliest patent that should be considered is that issued to Otto Manasse, in the United States, No. 526,786, October 2, 1894. Manasse was seeking to describe a method or process of producing phenolalcohols by using alkaline or neutral condensing agents, in aid of the reaction of formaldehyde on phenol or phenol-like substances. After mixing the phenol dissolved in the alkaline or neutral condensing agent with formaldehyde, and acidulating the resultant mixture, he separates the oxybenzylalcohol from the watery solution by extraction by ether. He then evaporates the solution so as to obtain a semifluid mixture which is treated with steam, thus driving off the residues of formaldehyde and phenol which have not entered the reaction. On cooling and filtering a resinous body is left, which apparently is the synthetic product in which both the plaintiff and the defendant in this case are in-

terested. But Manasse rejects this resin and treats further the solution in order to obtain crystals, which in turn, when dissolved in benzine, show a separation of oxybenzylalcohol from the parahydroxy-benzylalcohol which remains in the form of an amorphous powder in the solution.

The next patent, that of Blumer, Great Britain, No. 12;880, of 1902, refers to the Bayer experiments and others by Dobner and Lucker, by Voges and others, performed "with a view to the synthesis of resinous substances, but these have failed to yield any advantageous practical result." The Blumer patent consists in the synthesis of resinous substances by the condensation of oxy-acids with phenols with the interaction of formaldehyde. He obtains resins by operation of the various formulas set forth in the patent, which he says are of great practical value and are similar to shellac in all its properties.

Blumer used only the materials which he calls oxy-acids. In each case he has an acid reaction and there is no indication that his substance, prepared with acid, would be available either in the electrical arts or that such a resin would be infusible or insoluble. In his complete specification he states that they are readily soluble and that they are available for use as varnishes. He did not solve the problem of commercial availability nor teach what he did not accomplish.

The Smith United States patent, No. 643,012, of February 6, 1900, and the Smith, German, patent, No. 112,685, issued July 6, 1900, sought to obtain the production of a new material for electric insulation, and for many purposes for which ebonite, wood, and such substances were used in making electrical apparatus. He used acetic paraldehyde methylated spirits and liquid carbolic acid. He saturated his methylated spirits with hydrochloric acid gas, kept the temperature below 80 degrees F., and poured the mixture thus obtained into a mold which had been properly greased. After setting, he dried the molded article at 212 degrees F. In some instances he impregnated the article with paraffin. He produced a substance controlled by an acid solvent.

Smith never produced a practicable substance in which he could identify a reactive resin for the production of any infusible and insoluble material. His acid product was unworkable and useless.

The next patent is that of Luft, United States, No. 735,278, August 4, 1903, corresponding to the British patent No. 10,218, of 1902, and the German patent, No. 140,552, of March 28, 1903.

Luft states that he is seeking to obtain a plastic compound, which in the German patent he calls a "resinous mass," by making use of the "known fact that upon boiling phenols with aldehydes, and especially with formaldehyde, in the presence of acid, a mass results which when fresh is viscous and very plastic," and is capable of use in the arts.

Luft apparently began to work with the resinous mass which Manasse filtered out and discarded. This mass, Luft says, if dried, "ultimately becomes brittle." This mass is noninflammable and is not attacked by hot concentrated mineral acids or alkalies. He finds that a solution of camphor, rubber, glycerin, alcohol, or similar materials, prevents the hardening of this mass, and that the mass therefore remains more or less plastic if mixed with one of these substances. He

finds, also, that a harder or more elastic mass is obtained if the latter has been pressed in slightly warmed devices. If the viscous body, after washing with water boiled in the presence of an aqueous solution of alkali or alkaline carbonate, and then thoroughly washed, is dissolved in a suitable solvent such as a mixture of formalin and glycerin, and then thickened by continuous boiling, and thereafter poured into molds and dried at a temperature of 50 degrees C., it will be found that the mass is transparent, more or less plastic, useful for insulating purposes, and available as a substitute for celluloid, bone for billard balls, buttons, handles, rosettes, and the like. By the addition of suitable dyes and filling bodies, imitation amber, tortoise shell, meerschaum, resin, vulcanite, coral, etc., may be obtained.

Luft's process is expensive, and he never, so far as his own knowledge or the disclosure of his patent is concerned, got beyond the fusible and soluble state. It is evident, as was shown in court, that present knowledge of the art in the hands of an expert makes it possible to so manipulate the Luft process as to produce an insoluble and infusible final product, but Luft never did this nor taught it by his patent disclosure alone.

The next patents are those to "De Laire," which is said to be the name of a company in Paris, France. The British patent, No. 15,517, of 1905, the French patent, No. 361.539, of 1906, and the Belgian patent, No. 192,590, of 1906, are all stated to be for the manufacture of products of condensation of phenol alcohols resembling natural resin and capable of use as substitutes for amber, copal, etc.

Several examples of these products of condensation, or rather of formulas and directions for making them, are given. Phenolalcohols, in turn, are described as made "by condensing, in known manner, formaldehyde with phenol, its homologues, or derivatives, or with naphthols." Two of the examples describe a resin formed from saligenin and from paroxybenzyl alcohol, both of which are insoluble "in alcohol."

The novelty of the De Laire invention is to heat the phenolalcohols under reduced pressure. That is, De Laire seeks to obtain his result by the use of a condenser, working in as good a vacuum as possible, and the resins are obtained by solidification as water is evaporated, and the heating is continued until the water has all been removed or until the solid mass appears. He seeks to remove the brittleness of the soluble Luft resin and to produce a gum which can be turned, bored, etc. He does not disclose the idea of forming, shaping, and finishing the article in the process of producing the gum. He did not realize or disclose the ultimate insoluble and infusible product which now may be worked out of his suggestions.

The Story patents—British, No. 8,875, of 1905, French, No. 353,-995, of September 25, 1905, and the French addition, No. 9,861, applied for September 29, 1908—describe the production of a condensation product by the action of aldehydes on phenols, which are useful in contrast with the products of United States patent No. 735,278, German patent No. 140,552, and British patent No. 10,218, of 1902,

to Luft, which are said to be of little use and too expensive for practical purposes.

Story uses commercial carbolic acid containing 95 per cent. of phenols with formalin containing about 40 per cent. of formaldehyde. He pours his viscous product into molds which he dries at a temperature below 100 degrees C. He takes 50 parts of commercial carbolic acid and 30 parts of formalin and produces a substance which, having once become hard and dry, he states is insoluble in any known solvent and is not attacked by acids or alkalies. He states that in the viscous state it may be dissolved in alcohol, acetone, benzol, or other suitable solvent, and furnishes a good varnish for many purposes, from which the solvent may be removed by heat.

The Story patent is particularly interesting because the Redmanol Company manufactures and is putting upon the market in large quantities a product which evidently is produced according to the Story description. This result is obtained by long drying and heating, in some instances this period of heating at temperatures around 50 degrees C. lasting for over a year. Story suggests the adding of coloring matter or inert substances while in gelatinous state, and suggests in the addition patent drying at much higher temperatures in order to produce hardness and insolubility.

. Experiments during the course of the trial have satisfactorily shown that Story, as well as Luft and De Laire, can be ultimately operated so as to produce the infusible and insoluble substance which is known as "Bakelite C." This is the same substance which is shown and described in the Aylesworth United States patent, and which is also referred to in United States patent to Stephan, No. 812,608, February 13, 1906, on application filed December 6, 1904. But Stephan was seeking to make an antiseptic powder. His insoluble product was an accidental and not desired substance, obtained if his compound was heated too long. He produced an acid product, and certainly was not teaching the production of the insoluble substance, nor did he anticipate any of the other patents under consideration.

United States patent to Lebach, No. 965,823, July 26, 1910, application filed December 21, 1908, shows an improvement upon the Smith patent (supra) by postponing the addition of the acid or acid salt until the final reaction, thus enabling the resin or gum, or the product entering into the final reaction, to be kept for a considerable period of time, or to be transported in a way which would be impossible in the Smith reaction. This Lebach patent is objectionable through the use of the acids which Lebach suggests can be washed out after the product has been completed by the use of alkalies or alkaline solutions, such as ammonia, etc.

The criticisms urged against the Smith patent are all valid against Lebach, but in addition Lebach is subsequent to the applications for the Baekeland patents, and his statement, that he is working on the well-known methods of production of insoluble and infusible condensation products, as distinguished from those which remained fusible and soluble, shows that he was not attempting to claim invention or antici-

pation, for the discovery of the products themselves. Nor does the Lebach patent throw any light upon the condition of the prior art at the time of the Baekeland applications.

It is unnecessary to refer at length to the statement by Kleeberg, who as long ago as 1891 evidently produced an insoluble and infusible substance by the condensation of formaldehyde on phenols, but who could not control his reaction, and who thus hardened a foaming mass which was of no useful purpose.

Baekeland was in his experiments attempting to put to some useful purpose the reaction which Kleeberg could not control. The substance which Baekeland was seeking as his ultimate substance was similar in chemical analysis to Kleeberg's, and therefore solely as a substance; the insoluble and infusible material of Baekeland was not patentable when separated from his methods of reaching that result.

In a similar way, the patent to Blumer (supra), No. 12,880, British, June 5, 1902, who employed an oxy-acid in producing his reaction, and whose product was soluble like a natural resin, and the various chemists whose work was referred to in the De Laire patent (supra) and who produced either brittle or soluble resins of one sort or another, do not in any way affect the validity of the Baekeland patents, or of the other patents described in this action by which infusible products are obtained.

Baekeland has, throughout the testimony and in his literature in evidence, classified the shellac substitutes under the name of "Novolak." These substances are all permanently fusible and permanently soluble. They are characterized in most instances by an excess of phenol over the molecular proportions necessary to produce with formaldehyde the infusible and insoluble product. An excess of formaldehyde, on the other hand, does not prevent the formation of the infusible and insoluble product, if this excess be taken care of or removed during the reaction, and if the proportion of the products entering into the reaction be equi-molecular.

The earliest application of any one of the Baekeland patents was February 18, 1907, and the public description of Baekeland's researches was made in 1909, when various articles were read before the New York Section of the American Chemical Society, and printed in the Journal of Industrial and Engineering Chemistry during that year. These dates will become of importance when we consider the Baekeland patent involving the use of hexamethylenetetramin, which patent was in interference in the Patent Office with applications by Redman, Goldsmith, and Steinmetz, and out of which interference a patent was issued to Goldsmith for the so-called dry hexamethylenetetramin method, and to Baekeland for the wet hexamethylenetetramin method. The date is also important in connection with the defendant's claim that Baekeland did not know of the prior art patents when he applied for the heat and pressure patent in 1907. But he discussed these patents in his amendments of March 17, 1908.

In one of these articles, almost the last paragraph calls attention to researches by one Oscar Low, who "many years ago" called attention

to the formation of formaldehyde by the chemical action of sunlight on $CO_2$ in the presence of water in chlorophyl as a starting point for the synthesis in plant life. Baekeland also calls attention to the fact that the willow tree produces, in its cells, glucocides of saligenin. Saligenin or oxybenzyl alcohol in the presence of more formaldehyde $CH_2O$ gives Bakelite.

Baekeland calls attention to articles published several years before, in which the phenolic nature of resinous substances, such as Japanese laquer, show some analogy with Bakelite and similarity to the exudation of the plant known as poison ivy.

This paragraph throws a strong light upon the entire nature and construction of synthetic resins, and clears up much of the mystery which to the lay mind arises from the incomprehensibility of the organic reactions.

It will be well to catalogue, therefore, the Baekeland patents, and to state briefly the extent of each one, particularly looking to the earliest statement as to the production of the insoluble and infusible product, as well as the earliest disclosure of the use of pressure for the purpose of molding, as distinguished from counter pressure, for the purpose of preventing foaming and cracking, and also the earliest disclosures of the use of fibrous material as a filler, in distinction from the impregnation and coating of cellular tissue, in its integral form.

In the case of General Bakelite Co. v. Nikolas (D. C.) 225 Fed. 539, at pages 544 to 549, there is set forth a detailed statement of the different applications, proceedings in the Patent Office, and ultimate allowance of the various Bakelite patents. It does not seem that a repetition of this statement is necessary, but some reference to these applications and patents must be made in order to observe the chronology of the patentee's work.

A later reference will be made to patent No. 1,038,475, in which Baekeland states (line 74, p. 1, of patent):

"Instead of ordinary formaldehyde, I may use the polymers of formaldehyde, or such substances as engender formaldehyde during the process."

If used in conjunction with ammonia as a base, Baekeland says that this "will immediately react with formaldehyde, to form hexamethylenetetramin, as pointed out in my prior United States patent, No. 942,809, issued December 7, 1909. This patent, No. 942,809, was issued upon an application filed October 15, 1907, at a time when many of the other Baekeland applications were in the Patent Office.

He refers in the application for patent No. 1,038,475 (which was filed July 6, 1911, by a division of an original application filed October 4, 1909) to the contents of patent No. 942,809, which was not issued until December 7, 1909, or after the original application of October 4, 1909, had been filed. This would indicate that the precise language of the specifications in this regard was used at the time when the application was divided, that is, around the 6th of July, 1911, or later, and at a time when the Redman application of June 17, 1910, Goldsmith application of July 27, 1910, Baekeland application of December 13,

1910, and the Steinmetz application, of October 20, 1911, were all in interference.

In this interference Redman, in a brief filed, points out the Wetter British patent No. 28,009, of 1907, containing a direct statement that—

"Formaldehyde may be replaced also by its polymerization products, as well as by substances which yield formaldehyde, such, for example, as hexamethylenetetramin."

Redman tried to distinguish from Wetter by specifying proportions, and argued that Baekeland had disclosed the use of hexamethylenetetramin in his prior patents, citing Nos. 942,808, 942,809, 942,700, and 939,966.

In this interference Redman claims that the so-called wet hexamethylenetetramin process was anticipated by the prior art, and then claimed that the dry hexamethylenetetramin process, as set forth in the Redman and Goldsmith applications, contained the only novelty and was patentable.

It is intimated in the testimony in the present case that the parties acquiesced in the result of the Patent Office action along these lines, viz., that Redman was to be allowed by Baekeland undisputed activity in the dry hexamethylenetetramin field, while Baekeland used the wet hexamethylenetetramin process, and that Baekeland assumed the dry hexamethylenetetramin process would be commercially impracticable.

This is not admitted by the plaintiff in the present case, but is immaterial, for the plaintiff alleges that even if the Redmanol Company makes the molding mixture used by the defendant by a dry hexamethylenetetramin process, its use in molding by the defendant constitutes infringement, and also claims that the real difference rests in differentiation between the so-called two-step and the so-called one-step processes rather than between the wet and dry processes themselves.

It is apparent that if ammonia be added in excess of the slight proportion of base specified in patent No. 942,809, the gum can be formed and violent reaction can be prevented without confining the mixture by treating a part of the formaldehyde with ammonia, and thus through the formation of hexamethylenetetramin holding the ammonia and the methylene until the reaction with the phenols and cresols has quietly taken place. Ammonia will be driven off from the product by the application of heat, and the nitrogen present will impart a yellow or brownish color to the transparent final result.

If this process be performed, using at first a relatively small quantity of ammonia, a portion of the formaldehyde will immediately form hexamethylenetetramin or hexamethylenetetramin triphenol with an excess of phenol, unreacted upon by formaldehyde, resulting in a series of products known as saliretins, called by Baekeland novolaks, and by Redman phenylendeka-saligeno-saligenin. By heating at this point, the water present can be driven off. Ammonia will also be driven off, which can be collected and used to form, outside of the reaction, an additional supply of hexamethylenetetramin. By adding then an additional quantity of hexamethylenetetramin largely in excess of the amount of ammonia required by the patent No. 942,809, the whole of

the resin or nonreactive gum can be transformed into the final stage of the reactive substance, and this will give off ammonia if heated.

Thus we may have a two-step process, whether ammonium hydroxide or hexa be used as the original condensing agent for the reaction. It is also evident that no ammonia can be added without forming hexa, and we thus have hexa present in either the wet or the dry reaction.

Evidently Baekeland was aware of the chemical formation of hexa as early as the proceedings in the Patent Office resulting in patent No. 942,809, which was issued December 7, 1909. He specifies the use of ammonia as early as October, 1907 (application No. 397,560). There seems to be no reason why his patent No. 1,038,475 should be held invalid because it makes use of certain knowledge described in a co-pending application, even though that co-pending application was of an earlier date.

Even if Redman was entitled to a valid patent for the description of the preparations used by him in the so-called dry hexa method, the defendant using the Redman product would still be liable to a charge of infringement of the patents in suit, whether the hexa be added in a two-step or a one-step process, or in a wet or dry reaction. But the two-step process has in some respects a commercial advantage.

It is also urged that the use of hexa does not in any event infringe the Baekeland patents calling for use of formaldehyde and ammonia. This is a mere verbal argument, as hexa is well within the limit of equivalents but may still be the basis for an improvement of the method patent.

It will be necessary to return to this subject before the defense of invalidity is completely disposed of, inasmuch as Baekeland classifies ammonia (that is, the ammonium hydrate and the theoretical substance ammonium) as a base and contends that it was not disclosed by his reference to the use of "salts" and "alkaline solutions" as condensing agents or washing material of his earliest application, resulting in patent No. 949,671. Ammonia is alkaline and frequently called an alkali, but the substance ammonium is still fugitive and the reference to 949,671 is too indirect to anticipate the definite employment of ammonia as a base reacting agent of the later patents. Nor does Luft in speaking of an "aqueous solution of alkali or alkaline carbonate" seem to refer to ammonia or describe the action of ammonia so as to suggest its use.

But great difficulty persists throughout the case in confining the issues to the claims of the patents in suit, and to the acts of the defendant, the General Insulate Company, as distinguished from the rights and practices of the Redmanol Company.

The plaintiff charges infringement of patent No. 942,699, called by the plaintiff the "heat and pressure patent," No. 942,852, called by the plaintiff the "indurated product patent," and of patent No. 939,966, called by the plaintiff the "comminuted mixture patent."

Patent No. 942,699 grew out of an application filed July 13, 1907. It begins with the use of an oily, viscous, or semiplastic condensation

product, produced through some method in which the reaction has been controlled sufficiently to be arrested at the stage desired. The phenolic substances actually entering into the reaction are prevented from being present in excess by using formaldehyde in the molecular proportion required for the reaction, or having it present in excess. The filling material and the color is to be added before going on with the reaction, and the material is compounded as india rubber is compounded, that is, by mixing upon rolls proceeding at different speeds. After this compounding, the condensation product is poured or pressed into a mold, and while the pressure of the mold is maintained, a suitable temperature, from 110 degrees to 140 degrees C. or higher than that if the time for hardening is to be reduced, is created within the mold, and the heating or baking thus obtained completes the chemical reaction necessary to produce the infusible and insoluble product.

The claims in issue are 1, 2, and 4 (patent No. 942,699):

"1. The method of producing a hard. compact. insoluble and infusible condensation product of phenols and formaldehyde, which consists in reacting upon a phenolic body with formaldehyde, and then converting the product into a hard. insoluble and infusible body by the combined action of heat and pressure.

"2. The method of making articles containing an insoluble and infusible condensation product of phenols and formaldehyde. which consists in reacting on a phenolic body with formaldehyde, producing thereby a reaction product capable of transformation by heat into an insoluble and infusible body, forming the article from said reaction product, and rendering the article hard. insoluble and infusible by application of heat and pressure."

"4. The method of making articles containing an insoluble and infusible condensation product of phenols and formaldehyde, which consists in reacting on a phenolic body with formaldehyde, producing thereby a reaction product capable of transformation by heat into an insoluble and infusible body, forming the article from said reaction product compounded with a filling material, and rendering the article hard, insoluble and infusible by application of heat and pressure."

In this patent Baekeland avoids the necessity of eliminating water from the finished article, as is necessary under patent No. 949,761, and in this respect it resembles the so-called dry process of Redman, in that both proceed by two separate steps, in which the water of reaction is driven off during the first step, any moisture from the filling material or wood fiber is driven off during the working upon the rubber rolls, and the final reaction is a so-called "dry" process.

This disclosure makes it difficult to see why the defendant criticizes the third patent in suit (No. 939,966) and the Bakelite Company for not specifying the use of differential rolls to the defendant when it tried to use Bakelite as it had used natural gums. The argument and delay were unpleasant for Mr. Rockhill, but have no bearing on this case.

The next patent in suit, No. 942,852, was a division of the application for the previous patent, No. 942,699, and the claims in issue are 5 and 6:

"5. As a new composition of matter wood cell tissue impregnated with an infusible and insoluble condensation product of phenol and formaldehyde."

"6. As a new composition of matter, a fibrous or cellular material impregnated with an infusible and insoluble condensation product of phenol and formaldehyde."

A third patent in suit, No. 939,966, was issued upon an application filed January 28, 1909, under No. 479,869. It refers to three previous applications, No. 383,684 filed July 13, 1907, which resulted in patent No. 942,699; No. 397,560 filed October 15, 1907; and No. 405,021 filed December 4, 1907—each of which describes a method of obtaining the final condensation product.

This application No. 474,869 was filed prior to the division of application No. 383,684 by which on March 17, 1908, the patentee filed the application resulting in No. 942,852.

The claims of patent No. 939,966 in suit are:

1. The method of molding articles which consists in comminuting a partial reaction product of phenol and formaldehyde, molding the mass under pressure, and transforming the same into an insoluble and infusible condensation product.

2. The method of molding articles which consists in comminuting a partial reaction product of phenol and formaldehyde, molding the mass under pressure, and transforming the same in the mold into an insoluble and infusible condensation product.

3. The method of molding articles, which consists in preparing a comminuted mixture of a partial reaction product of phenol and formaldehyde and a filling material, molding said mixture and transforming the partial reaction product into an insoluble and infusible final condensation product.

Many fillers have been used in the prior art in all sorts of compounds. Some of them acted as coloring materials as well as fillers. In patent No. 942,699, Dr. Baekeland suggested as filling materials, "as for instance asbestos fiber, wood fiber, other fibrous or cellular materials, rubber, casein, lampblack, mica, mineral powders as zinc oxid, barium sulfate, etc., pigments, dyes, nitrocellulose, abrasive materials, lime, sulfate of calcium, graphite, cement, powdered horn or bone, pumice stone, talcum, starch, colophonium, resins or gums, slate dust, etc."

These fillers have many and various qualities. Some are better than wood flour or wood cell tissue, some of them stand higher temperatures without charring, some of them have less water subject to liberation, others interfere less with the flowing qualities of the mixture for introduction into molds. But one quality of fibrous material, such as wood flour or asbestos fiber, was made use of because of a habit of these phenolic condensation products at the time of final hardening, in that they then contract materially and develop internal stresses, which make them easily shattered in spite of their hardness and tremendous tensile strength.

Baekeland sets forts in his specification that rubber when hardening in the vulcanizing process swells, that shellac and celluloid neither swell nor contract, and that shellac and celluloid are more flexible than the final condensation product with which the patent deals. But the use of fibrous or cellular filling materials causes a physical change in the product, which enables it to withstand shocks and makes it useful for commercial purposes, particularly in the electrical arts. The qual-

ities of wood fiber were known, but the employment of these qualities and the appreciation of their availability was invention.

The third patent in suit was the first to describe three stages in the phenolic condensation reaction. It must be borne in mind that as soon as we have gotten away from gums or synthetic resins of the novolak type, we begin to deal with what is called in the testimony a "reactive resin."

In the previous case (General Bakelite Co. v. Nikolas, 225 Fed., supra) a reactive film was defined as a film which could be transformed by subjecting it to heat, light, air, motion, or electricity, without the addition of any chemically acting substance. In the present case we are dealing with reactive resins, that is, condensation products which can be transformed by the application of heat alone, or transformed and controlled by the application of heat and pressure, or transformed by the application of heat followed by evaporation or drying, into an infusible or insoluble product, without the addition of chemical substances to carry on the reaction.

It must also be borne in mind that in processes like Smith, De Laire, Luft, or Story (supra) acids or solvents may be neutralized by alkalies or removed by washing in water to obtain the reactive resin. The phenolic gum may thus be removed from the novolak class to the reactive class, but when once in the reactive class, the final infusible and insoluble product may be obtained through the chemical changes induced by heat alone. But undue or uncontrolled exothermic heat will produce a useless substance like that found and discarded by Kleeberg. So a viscous, sticky, oily and plastic mass, even though it is capable of transformation by heat, that is, even if it is in the reactive resin class, is still incapable of physical mixing with dry powders or substances, and is incapable of long preservation and convenient handling or transportation.

This difficulty Baekeland sought to obviate by the old idea of drying or hardening into a form of substance which could be ground or broken into fragments or even into powder. The idea of doing this was old. The idea of mixing fillers and pigments or coloring materials with such a dry and fragmented product was old. The idea of mixing the last (whether it be final or merely cooled novolak material) product was old. Luft and De Laire had both made use of the idea of mixing their products with coloring material and fillers, and of pressing these materials in molds, or of letting them set by cooling and drying so as to obtain the desired shapes, or so as to obtain materials which could be planed, turned, bored, worked, or machined in any desired way. But Baekeland undertook to obtain a material in which the mixing or preparation with the filler and coloring material could be done before reaching the last stage of his product. He did not desire to have his product merely set or harden and contract in the mold, or after removal from his mold, and he wished to have the reaction take place after the fillers and coloring material had been added. He therefore claimed as invention the method which would produce, as the final step in the chemical reaction, that product which was obtained at the close of the final step in the physical operation of molding, and by which the finished

article, when released from the mold, would, without further work or machine treatment, conform exactly to the qualities and measurements of the article desired. He was not, therefore, using the same method as Luft and De Laire and Story to produce the same product as Kleeberg. He was not using the methods of the prior art in merely mixing fillers and using molds for shaping under pressure; in fact, in none of the Baekeland patents is the material, which Kleeberg obtained in useless form, sought to be patented. What Baekeland claimed was a new method of producing the material, or commercial products containing the material, which Kleeberg had described, which had been found by others, and which experiments conducted during the course of the trial show that De Laire, Luft, and Story might have obtained, that is, an infusible and insoluble condensation product of phenol and formaldehyde. Luft, however, was not seeking and did not describe this insoluble and infusible product, except in so far as he apparently found, under certain conditions, that his product, insoluble in alcohol but soluble in other solvents, when mixed with fillers and dies, capable of molding by pressure under low heat, produced a gum or substance resembling amber, which could be turned, bored, or polished. In some of his experiments Luft evidently found the nondescript substance which was not soluble, as were the novolaks, and which approached the insoluble qualities of Kleeberg's experiments. But these only caused him difficulty, and it needed much further development of the art before the ideas that were present in the mind of Luft could be identical with the invention of Baekeland, who made use of the Kleeberg chemical substance as the principal constituent of the insoluble and infusible product, which was the ultimate end and also the entire basis of the Baekeland claims.

De Laire was trying to avoid the acid reactions of the Luft product, and progressed no further than Luft in making use of the final reaction product as the medium with which to produce the commercial products which he wished to use as substitutes for natural gum products, and which he undertook to use in just the way in which natural gum products were treated.

Story, like Luft and De Laire, depends upon the solvent (in his case an excess of phenol or cresol) to hold back the violence of reaction, and then evaporates the solvent. His product shrinks or diminishes in size. An exposed surface is necessary. In his patent he says formaldehyde is given off throughout the process. Evidently he carried the drying only to the point of a few hours instead of days or months. As practiced by the Redmanol Company, Story is an open air process as distinguished from the heat and pressure process of Baekeland. The defendant, even if he starts with material which in the early stage is made with hexa but following Story in general methods, then proceeds to use the reactive resin with heat and pressure and departs from the Story patent.

The prior art as stated by the witnesses in the case representing the manufacture and use of hard rubber and of insulating material composed of fillers, coloring matter, and natural gums, shows plainly that

all phases of molding were old; that the use of the differential rolls was old; that the evaporation of moisture while the material was being worked on the rolls was well known; that the amount of heat and the duration of its application must be governed by the material used and the object sought to be obtained. This prior art shows also the employment of fibrous materials as binders. But Baekeland did much more than take a material shown by the prior art, whether it be called Luft, Story, or Kleeberg, and mold or treat it by methods which, of course, were open to the use of any one, with respect to any substance which they wished to employ.

If Baekeland had claimed as invention the operation of mixing the rejected gum of Manasse with fillers and coloring matter, heating this to any temperature which he thought would make it easily shaped in a press, and then to press it, either with a maintained heat or an increased heat, or to immediately apply some cooling means so as to harden the material and then release it from the mold, there would be no novelty in any of these steps except that he had put together a combination of materials and pressed them and that they had not been thus united before.

But there would have been no novelty of result or process in such a combination. The defense attacks the Baekeland patents as if they were describing mere combinations in which the new material was nothing more than an equivalent for one of the materials of the prior art in carrying out the particular combination of the process patent.

If this were all that Baekeland did, he would be anticipated by Luft, De Laire, and Story, for he describes processes in which he uses either different materials or different steps, which in that sense are merely equivalents for the materials or the steps described by these prior art patents. But Baekeland is describing the manufacture of certain materials, in which a realization of certain desirable qualities is accomplished by the use of certain processes which are analogous or even similar to the combination of steps or process used by the inventors of the prior art. Baekeland claimed as invention the processes by which with certainty he produced just the result which he desired, and described this as a new method rather than a mere combination or aggregation of materials and steps. And he also claimed as a product the commercial result or the material which was available for commercial use and which was obtained by just those processes and the use of just those materials which Baekeland realized would produce the steps which he desired.

As was said in the case of General Bakelite Co. v. Nikolas, supra, if artificial diamonds could be produced, no one could claim as invention the substance already known as diamonds, and if the imitation could not be told from the original, no inventor could control all the material of that nature, whether produced naturally or artificially, but the inventor who does finally invent a process for manufacturing genuine diamonds, by artificial means, will be able to claim as an inventive product that material which any one is producing by the steps covered by his invention, if he obtains a patent therefor.

Thus in all the Baekeland patents, the product which is sought to

be patented is not the material which can only be identified as an infusible and insoluble condensation product of phenol and formaldehyde. But Baekeland can validly claim a new product which is produced by exactly the steps which he has described and which makes use of the ideas which he recognized and claimed as invention, in arriving at a result which may then contain or even be substantially composed of a substance that of itself is not patentable, provided it can be shown that it was manufactured in a way not taught by the prior art, and can be identified by the original methods or steps in the process.

Baekeland could also obtain valid patents for a varnish, for an indurated material and method for the making of a solid substance out of impregnated or filled cellular tissue, for obtaining a simple and desirable reaction product by the use of small amounts of accelerating base, or by the use of substances engendering ammonia, if in each of these patents his claim for invention depended upon recognition by him of the processes and principles which he had discovered and which had not been described in the prior art.

[8] A separate patent application for each of these processes or products could be successfully maintained in the Patent Office and separate patents could issue thereon, if these applications were co-pending. The date of allowance and issue of any one of these patents would not determine the validity of any other of the co-pending applications, nor could these earlier patents be cited as prior art against the other applications pending at the same time.

The defendant takes a reactive synthetic product of phenol and formaldehyde, manufactured by the Redmanol Company (which sells this in granulated and in sheet form), it mixes it with coloring matter and fillers, it works the mixed material upon the rubber rolls, and thus dries out moisture from the wood filler, it applies a considerable degree of heat (around 400 degrees F.), it employs pressure sufficient both to prevent foaming or bubbling, and to accomplish molding it maintains this pressure for a considerable time, thus allowing the reaction to take place in the heated product under pressure in the mold. It thus follows rather the art of vulcanizing rubber than the art of molding with natural gums.

When the defendant first tried to use Bakelite, it had difficulties in this direction, because the heat applied was in degree and in duration of application like that which had been employed for molding natural gum products. The defendant attempts to show that the Baekeland patents do not sufficiently disclose the methods necessary to secure a commercial article, because these patents do not specify the precise way in which the heat shall be applied, with the amount of heat and the time of the application, nor in each patent prescribe mixing on differential rolls.

But these patents do not claim the invention of a mechanical process of molding; they claim invention in that the molding is used to produce the chemical reaction and to turn out the completed product. The one skilled in the art, therefore, who is to read these patents, must read them as a chemist and not simply as a molder, but he should

also use his knowledge as a molder. It is evident that the defendant now understands sufficient of the chemistry involved so that it obtains the final and desired result.

But it is no defense to the charge of infringement to say that it did not earlier understand the patents and that it met with failure. The Redmanol Company manufactures and places on the market, in large quantities, the Story product, which is formed by the evaporation of the solvent. Until this evaporation occurs, the great excess of phenol plainly differentiates the process from any of those covered by the Baekeland patents. Story says, in his French addition, that by long heating at about 50 degrees C., a much harder product will be obtained, but he adds that formaldehyde will continue to be thrown off.

The testimony in this case shows that the release of formaldehyde ceases substantially in about 24 hours. The Redmanol Company takes months for the setting and evaporation of its so-called Story product. It then has a product which is nonreactive, as it has reached its final stage, which cannot be further molded under heat and pressure so as to undergo further chemical change, and which cannot then, in its ultimate state, be mixed with coloring matter and dyes and molded further.

The defendant contends that no infringement has been shown because the evidence shows that the material used for molding is not entirely or absolutely insoluble and infusible. In other words, the Redmanol Company, for commercial purposes, stop a little short of the completed reaction and sells a still potentially reactive resin. But this applies to the Redmanol product rather than to the defendant's molded objects, and does not contradict the proposition that the patents in suit are actually infringed.

In so far, therefore, as the defendant does not use the Story material of the Redmanol Company, there would seem to be little question but that it is using the various processes covered by the claims of the Baekeland patents in suit, in that it has a reactive condensation product, used with fillers and coloring materials, molded under heat and pressure, in order to form the final product, or in order to form the commercial articles composed of the final product and the filling and coloring materials desired. It even goes so far as to employ its old material, wood filler, for the exact purposes claimed by Baekeland, who, as has been held, showed invention in the choice of materials to meet particular needs and to get particular results.

The material which the defendant purchased from the Redmanol Company for its processes of molding is, however, not Story; it is a reactive phenolic condensation product, made by the condensation of hexa upon phenols or commercial carbolic acid purchased in England and containing a large percentage of cresols.

The defendant seeks to escape the charge of infringement by urging the defense presented by the Redmanol Company, that hexa was not covered or disclosed by the specifications and claims of any of the Baekeland patents, until patent No. 1,038,475, and that the use of hexa by Redman constituted a new invention, giving him the right not only to manufacture synthetic reactive gums, with this substance and

with carbolic acid, but also to make the various products by the use of dyes and fillers and the employment of molding processes, which Baekeland has attempted to obtain by the patents in suit, and the others described in this case.

As has been stated in his earlier patents, Baekeland discloses the use of substances engendering formaldehyde. It is apparent that hexa is immediately formed upon the introduction of ammonia and formaldehyde. The independent discovery by Redman of the possibility of using hexa, in order to avoid the necessity of drying out the water or moisture remaining in the original reaction product, was antedated by Baekeland's writings and patent specifications, which specifically claim ammonia and the substances engendering ammonia as a part of the Baekeland series of inventions. Redman's invention is therefore dependent upon his methods of manufacture at atmospheric pressure and with a dry compound of formaldehyde and ammonia, rather than from the use of hexa as such.

The use of hexa, therefore, does not get the synthetic gum outside of the Baekeland disclosures and claims. If the defendant makes use of the processes patented by Baekeland, when applied to the substances described by Baekeland, in the production of the commercial material covered by the Baekeland inventions, then it cannot escape the charge of infringement by showing that this material was produced by the Redmanol Company with hexa, instead of with formaldehyde and ammonia separately. In other words, hexa is but an equivalent for formaldehyde and ammonia, and the defendant company is using this equivalent material in carrying out the process of the Baekeland patent. In this sense the defendant is in a position analogous to a contributory infringer if the Redmanol Company were a primary infringer.

But when suit is brought against the defendant directly for infringement by what it does with a material which does not itself infringe, then the maker of the material might perhaps be charged with contributory infringement if it purposely causes the infringing use. The distinction is not of importance in the present case. We have only the defendant to consider, and it has been shown to have committed acts, used methods, and made products infringing the claims and patents in suit.

The defendant contends that the specifications and claims of the heat and pressure patent (No. 942,699) show only, and that the evidence in the case proves that Baekeland had in mind only, the use of counter pressure to prevent violent expulsion of ammonia. It is claimed that he later attempted to include molding pressure, when he realized the need of securing the chemical reaction during the molding and heating process. But while the original claims were not as broad as those finally allowed and were evidently drawn without any attempt to include in words the molding pressure, the language of the specifications shows clearly both understanding of the need and use of molding pressure, and indicates Baekeland's intent to include it in his claims. His subsequent amendments were therefore allowable, and there is no reason for limiting the valid range of the patent as issued.

In a similar way, the defendant argues that the only novel feature claimed in the indurated material patent (942,852), as originally presented, was to secure the removal of moisture during an old or well known reaction for the purpose of impregnating or hardening wood. The separation of water was an essential step, but was not the only one disclosed, and the specifications fully support the claims as finally allowed. One of the materials to be indurated was cellular wood flour, and the impregnation and induration was had in order to make this into blocks or solids. The history of the patent in the Patent Office shows that Baekeland appreciated, at least, the possibility of claiming more than was expressed by the apparent understanding of the examiner and the present contention of the defendant.

The claims are valid and cover molding, with wood flour, and coloring material.

Patentability having been shown, the claims upheld in form, and the defendant proved to have infringed, the plaintiff may have a decree.