### BAKELITE CORPORATION v. BRUNS-WICK-BALKE-COLLENDER CO.

(Circuit Court of Appeals, Third Circuit. March 3, 1927. Rehearing Denied May 2, 1927.)

No. 3434.

1. Patents ☞328—942,699, claim 1, relating to making insoluble products of phenol and formaldehyde, held valid and infringed.

Baekeland patent, No. 942,699, claim 1, relating to method of making insoluble products of phenol and formaldehyde, held valid, and infringed in manufacture of billiard balls.

2. Patents ☞154—Patentee of new process for making new product, by disclosing one method, did not disclaim all others using same ingredients and agencies.

Patentee of new process of making a new product, relating to method of making an insoluable and infusible product of phenol and formaldehyde by heat and pressure, did not by disclosing one process, as required by statute, disclaim all others which used same ingredients and employed same agencies to produce identical product.

3. Patents ☞328—942,809, for insoluble and infusible product of phenol and formaldehyde, held not infringed.

Baekeland patent, No. 942,809, relating to method of making insoluble and infusible condensation product of phenol and formaldehyde, held not infringed in the manufacture of billiard balls.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Patent infringement suit by the Bakelite Corporation against the Brunswick-Balke-Collender Company. Decree for defendant (7 F.[2d] 697), and plaintiff appeals. Reversed in part, and affirmed in part.

Charles Neave, of New York City, C. P. Townsend, of Washington, D. C., and Maxwell Barus, of New York City, for appellant.

William H. Davis, Frank E. Barrows, and John F. Neary, all of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] This case, a patent one, concerns a billiard ball, which defendant makes, and which plaintiff alleges infringes its patent. The ball defendant makes, and which takes the place of the commonly used ivory billiard balls, is made of phenol and formaldehyde, and prior to the plaintiff's patent no such billiard balls were ever made or their possibility suggested. There being no such prior art, the plaintiff's assignor, Leo H. Baekeland, on July 13, 1907, applied for and on December 7, 1909, was granted patent No. 942,699, for a "method of making insoluble products of phenol and formaldehyde." Describing what the product of his alleged invention was, Baekeland says: "The present invention relates to the production of hard, insoluble, and infusible condensation products of phenols and formaldehyde"—terms which aptly describe the billiard ball of defendant, which is hard, insoluble, infusible, and is made from phenol and formaldehyde, so that no question of identity of constituents, substances or of final product, is here involved.

Continuing and describing his method, Baekeland proceeds: "In practicing the invention I react upon a phenolic body with formaldehyde to obtain a reaction product which is capable of *transformation by heat* into an insoluble and infusible body, and then convert this reaction product, either alone or compounded with a suitable filling material, into such insoluble and infusible body by the *combined action of heat and pressure.*" For this alleged invention he was granted, inter alia, claim 1, as follows: "The method of producing a hard, compact, insoluble, and infusible condensation product of phenols and formaldehyde, which consists in reacting upon a phenolic body with formaldehyde, and then converting the product into a hard, insoluble, and infusible body by the combined action of heat and pressure."

We here note that the description of the invention and the claim are both in broad, generic, and inclusive words, and prescribe three elements: First, reacting on a phenolic body with formaldehyde; second, converting that body by the combined action of heat and pressure; and, third, thereby producing a hard, insoluble, and infusible condensation product of phenols and formaldehyde. It is this claim with which we have to deal.

Showing, as he was bound to do, a practical way of practicing his method, Baekeland set forth one in detail, wherein by the use of the two specified ingredients, phenol and formaldehyde, and the two specified agencies, heat and pressure, "there is obtained in from

one to two hours or less a hard, compact, perfectly homogeneous mass similar in its properties * * * to ivory, insoluble in alcohol, acetone, and resistant to heat or infusible, and resistant to moisture and most chemical reagents as above described."

Was this patent valid? The question is nót new, for this patent, inter alia, was in issue in General Bakelite Co. v. General Insulate Co. (D. C.) 276 F. 166, where an exhaustive opinion was delivered by Judge Chatfield, and, by reference thereto, we preclude a needless repetition of the work of prior inventors, the materials used by them, the methods they employed, and the products obtained. Summarizing his views, he thus states his conclusion:

· "In the present case, no patent has been cited directly as an anticipation. The prior art contains few patents for synthetic phenolic condensation products, and, even though the plaintiff's patents should be construed so broadly as to bring in doubt their validity as inventions over the prior art, still no one of the prior art patents is exactly an anticipation of the subject-matter, which evidently was the invention of the plaintiff's assignor in the particular patent. It is unnecessary to cite the many patents from the prior art relating to the subjects of molding and hot-pressing various materials, whether to form the molded object by cooling or to cause chemical change under heat and pressure. Nor is there need of citing from the prior art the many patents in which inventors have attempted to protect particular formulas of compositions for so-called artificial or imitation ivory, ebonite, amber, and similar substances for use in the manufacture of billiard balls, doorknobs, buttons, electrical apparatus, etc. These patents show novel physical combinations or substitutes for substances, whose use, when pressed cold or hot, was obvious, or they teach various chemical and physical aggregations· to imitate natural products or to provide varnish, insulation, or solids of elastic and other qualities. They taught nothing as to the creation of synthetic condensation products, and left the prior art with mere knowledge of melting, dissolving, solidifying, pressing, turning, boring, polishing, and cutting materials, which proved the demand for substances which were never thought of until phenolic condensation products were discovered. To guess that the new substitute material could be used as a substitute, or that similar uses were desirable, was not invention. But to find how to make the substitution successfully was invention,

18 F.(2d)—25

and so was the discovery of methods solving the difficulties encountered. * * * Baekeland claimed as invention the processes by which with certainty he produced just the result which he desired, and described this as a new method, rather than a mere combination or aggregation of materials and steps. And he also claimed as a product the commercial result, or the material which was available for commercial use, and which was obtained by just those processes and the use of just those materials which Baekeland realized would produce the steps which he desired."

This summary commends itself to us, and in support thereof we note that in all this great record there is no evidence that any one before Baekeland produced a commercial synthetic billiard ball "similar in its properties * * * to ivory," as noted in his specification, or as made by the defendant in alleged infringement. Regarding, then, the patent valid, the next question is: Does the defendant infringe? Confessedly the defendant's billiard ball is "a hard, compact, insoluble body," and therefore, so far as those earmarks are concerned, it is in that respect a replica of Baekeland's product. Such being the identity of billiard ball product, and as no such billiard ball was made· prior to Baekeland's patent, two situations arise, viz. first, if in using the same ingredients, a different process is followed, there is no infringement; or, second, if the same ingredients are subjected to the same process, there is infringement.

Now there is no question but that the defendant uses the same ingredients as the plaintiff, viz. phenol and formaldehyde, and from their joint use obtains a product identical with Baekeland's. Using, then, identity of ingredients, and obtaining identity of product, it follows there is presumable infringement, unless the defendant shows that its process, though using the same ingredients and obtaining the same product, is a process substantially different from that disclosed and claimed in the patent. Accordingly we first turn to the patent, to therefrom ascertain what was the process disclosed and claimed by Baekeland to produce his new product. In pursuance of the statutory requirements he states his invention in the words already quoted, viz.: "The present invention relates to the production of hard, insoluble, and infusible condensation products of phenol and formaldehyde."

We note at this point that, as bearing on the alleged infringing product in this case, and certainly that is the concrete practical subject-matter of this case, the new thing by

which Baekeland benefited the public was a new product or output, viz. hard, insoluble, and infusible condensation products of phenol and formaldehyde," and while he also, as we shall see, was bound to, and in fact did, show one way in which it could be made, this latter was the statutory requirement, enabling the public to use the invention when the patent expired; but the real benefit he alone conferred on the public, so far as this case is concerned, and what the defendant makes and sells to the public, is the "hard, insoluble, and infusible condensation products of phenol and formaldehyde," in the shape of a synthetic billiard ball, which in appearance and function resembles genuine ivory balls.

[2] We thus note this fact initially of a new product in an untilled field as the gist and substance of the patent, because, if it was a new step in synthetic chemistry production, if it defined and fenced off a field theretofore untilled, and therein produced a new and hitherto unknown product, this fact, this really remarkable contribution in one of civilization's centuries old sports, materially affects the angle and view in which we consider the important, for disclosure and practice sakes, but all the same minor, detail of the means he suggested by which his major product could be made. And the same considerations affect the construction given the claims, whereby this major object is practically and exclusively secured to him for the limited term of his patent. So, also, while he showed, as he was bound to do, one process, assuredly the showing of this one was not a disclaimer of all others, which used the same ingredients and employed the same agencies, to produce his identical product. And in that connection we note that, in the practice he did disclose, he specified two elements or agencies, which, as we read the record, had never been theretofore used to convert phenol and formaldehyde into a "hard, insoluble, and infusible product," which was "similar in its properties * * * to ivory, insoluble in alcohol, acetone, and resistant to heat, or infusible and resistant to moisture and most chemical reagents as above described," to wit, the use for that purpose of heat and pressure.

Phenol was old and its general properties known; so also was formaldehyde. Their reactions on each other were old. The effect of heat upon them and the use of pressure were known, but with all this knowledge no one had ever used them so as to produce the product which Baekeland made them yield. And this productive, broad, general, and novel use of heat and pressure, resulting in a "hard, insoluble, and infusible condensation product,"

is clearly disclosed in the specification, and the equally broad, generic, and nonspecific agency of conversion by heat and pressure was claimed and allowed as a conversion of phenol and formaldehyde "by the combined action of heat and pressure." We therefore note the significant fact that this claim has no limitation as to the way heat and pressure are to be used, other than that conversion is to be made "by the combined action of heat and pressure."

Turning, then, to studying the claim quoted above, we note it contains but three elements: First, the chemical reaction of phenol with formaldehyde, or, to use the words of the claim, "reacting upon phenolic body with formaldehyde"; second, the physical agencies, again referring to the claims, "by the combined action of heat and pressure"; third, conversion, or to again use the words of the claim, "converting the product into a hard, insoluble, and infusible body." We also note the physical converting agency granted by the claim is granted in broad, generic terms, viz. "by the combined action of heat and pressure" and without limitation to some specific form of heat and pressure use. It would therefore seem that, if the rights of the patentee are defined by the claim, and protection is granted him on the terms of the contract embodied in such claim, and if the claim elements are stated in such clear terms as disclose their meaning, the case resolves itself, not into the speculative contention of opposing scientists, but into simple questions of fact.

So viewing the case, we have confronting us these simple, basic, decisive questions:

First, is there in the defendant's practice, in the words of the claim, a "reacting upon a phenolic body with formaldehyde"? Assuredly so. It brings phenol and formaldehyde into relation, and reaction takes place, and we therefore have identity of material in the patentee's claim and the defendant's practice.

Second, does the defendant's practice, whatever its intermediate steps, finally result, to quote the words and test of the claim, "in producing a hard, compact, insoluble, and infusible condensation product of phenols and formaldehyde"? Assuredly so; its synthetic, phenol-formaldehyde billiard ball measures up to the claim test of product. We have, therefore, in addition to identity of materials, identity of product in claim, and alleged infringement.

This brings us to the third question. Is the defendant's practice one, using the words of the claim, "converting the product into a

hard, insoluble, and infusible body, by the combined action of heat and pressure"? Heat. Pressure. The meaning of the words, the functions of those commonplace agencies, are well understood; their varying effect, when used in different degrees and relations, are matters of common knowledge, and the claim directs that · these two agencies, and their several functions, and their consequent effects, are to be used jointly, and so co-operate and be so bound. together that, in the words of the claim, there is used "the combined action of heat and pressure." The claim sets apart at one end of the line phenol and formaldehyde; at the other end it delivers the product, and midway it provides heat and pressure. With these three elements, all vital and essential, the claim stops. At what intermediate time, stage, step, or mode, either heat or pressure are to be used, is not specified in the generic and all inclusive words of the claim, viz. "the combined action of heat and pressure."

Without, therefore, discussing the several steps of the defendant's progressing practice, in which phenol and formaldehyde are jointly used, it suffices to say that its coarsely ground, previously dried, and partially infusible and insoluble product, from such treatment of these two ingredients, is, to use the description of the defendant's process, as stated in the opinion of the court below, "put into molds and heated, under pressure of 3,-500–4,000 pounds per square inch, for 45 minutes, at a temperature of about 300 degrees F. in a performing press. Upon the removal of the balls from the molds, they are again subjected to heat and pressure—gunning—of 3,600–4,000 pounds per square inch for 35 minutes at a temperature of 340 degrees F. in a Hyatt hydraulic gun, described in Hiatt patent No. 239,791 of 1881," where, without doubt, further condensation takes place under heat and pressure.

Convinced, as we are, that the defendant's use of identity of ingredients and identity of means, with those which alone are specified in the recited claim, that by such use they obtain identity of result, namely, a synthetic billiard ball, "hard, insoluble, and infusible," a product first disclosed by this patent, we are justified in adjudging patent No. 942,699 valid and infringed.

[3] It remains for us to consider Baekeland's other patent, No. 942,809, granted December 7, 1909, for "a condensation product and method of making the same." Such patent was for an improvement on the process we have above discussed, and it is thus stated in his specification: "The addition in proper proportions of an organic of inorganic base to a mixture of phenol and formaldehyde, or to either component of the mixture, facilitates the reaction and yields products which are commercially far superior to those obtained by simple heating, or by the use of acids or salts as condensing agents. * * * According to my invention, the alkalies or bases are used in such relatively small proportions that their presence does not interfere with the desirable qualities of the products, rendering it unnecessary to eliminate them by washing or neutralizing."

This small quantity of the condensing agent was fixed by the claim, viz.: "A base serving as a condensing agent, the proportion of base in the product being less than one-fifth of the equimolecular proportion of the phenolic body used." The defendant contends that it used as a base condensation agency in such a substantially larger proportion as left it far without the claim, and, moreover, that at a later stage it injected such a quantity of acid that it completely neutralized the alkali and thus used an acid condenser. The plaintiff contends such complete neutralization did not take place, and that defendant finally used, as a condenser, in quantity, the base stated in the claim. On this issue of fact the court below found with the defendant, and, without entering into a discussion of the proofs, we limit ourselves to saying we agree with its finding of fact and conclusion of noninfringement.